# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

CYBERWORLD ENTERPRISE        :
TECHNOLOGIES, INC. d/b/a/       :
TEKSTROM, INC.,                :
                                 :
       Plaintiff,             :
                                 :
   v.                     :     C.A. No. 1:06-cv-00402-***
                                 :
MICHAEL CHERTOFF, Secretary of  :
the Department of Homeland Security;  :
ALBERTO GONZALES, Attorney General; :
ELAINE L. CHAO, Secretary of Labor;  :
EMILIO T. GONZALEZ, Director, United :
States Citizenship and Immigration Services; :
                                 :
       Defendants.          :

## <u>BRIEF IN SUPPORT OF DEFENDANTS' MOTION<br>FOR SUMMARY JUDGMENT</u>

COLM F. CONNOLY
United States Attorney

SETH M. BEAUSANG (DE I.D. No. 4071)
Assistant United States Attorney
1007 N. Orange Street, Suite 700
P.O. Box 2046
Wilmington, Delaware 19899-2046
(302) 573-6277, ext. 149
(302) 573-6220 (fax)

OF COUNSEL:

HOWARD M. RADZELY
Solicitor of Labor
United States Department of Labor

STEVEN J. MANDEL
Associate Solicitor
Fair Labor Standards Division

WILLIAM C. LESSER
Deputy Associate Solicitor

JONATHAN M. KRONHEIM
Counsel for Trial Litigation

JOAN BRENNER
Attorney
Office of the Solicitor                       Dated: January 11, 2007

# TABLE OF CONTENTS

*Page*

NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . . . . . . . . . . . . .   1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

    A.    Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

    B.    Decisions of the ALJ . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

    I.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . .   10

        A.    Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . .   10

        B.    Judicial Review of Agency Proceedings    . . . . . . . . . .   11

    II.    STATUTORY AND REGULATORY FRAMEWORK . . . . . . .   12

    III.    BECAUSE THE USE OF THE WORD "SHALL" TO SET
        TIME LIMITS IN THE APPLICABLE STATUTORY
        AND REGULATORY PROVISIONS IS DIRECTORY
        RATHER THAN MANDATORY, THE SECRETARY IS
        NOT REQUIRED TO COMPLETE AN
        INVESTIGATION IN 30 DAYS IN ORDER TO
        MAINTAIN JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . .   17

    IV.    THE ALJ PROPERLY DETERMINED THAT
        DEBARMENT UNDER THE H-1B STATUTE AND
        REGULATIONS WAS MANDATORY BECAUSE OF
        CYBERWORLD/ TEKSTROM'S FAILURE TO MAKE
        THE DISPLACEMENT INQUIRY OF ITS SECONDARY
        EMPLOYERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

        A.    Under the Applicable Provisions and Its Own LCA
            Attestations, Cyberworld/Tekstrom Was Required
            to Make the Displacement Inquiries Regardless of
            Where the Workers Were Placed . . . . . . . . . . . . . . . .   22

*Page*

      B.     Referral to the AG for Purposes of Debarment Was
               Mandatory Under the Applicable Provisions  . . . . . . . . .    25

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    31

EXHIBIT A:

     Kolbusz-Kijne v. Technical Career Inst.,
     1993-LCA-4 (Sec'y July 18, 1994)

EXHIBIT B:

     United States Dep't of Labor v. Beverly Enters., Inc.,
     ARB Case No. 99-050 (July 31, 2002)

EXHIBIT C:

     United States Dep't of Labor v. Nurses PRN,
     ARB No. 97-131, ALJ No. 94-ARN-1 (June 30, 1999)

EXHIBIT D:

     The Certified Administrative Record below, cited herein as AR at ____.

## TABLE OF AUTHORITIES

*CASES:*                                                                         *Page*

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Atlantic Cleaners & Dyers, Inc. v. United States,
    286 U.S. 427 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Barnhart v. Peabody Coal Co.,
    537 U.S. 149 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,
    419 U.S. 281 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

Brock v. Pierce County,
    476 U.S. 253 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7,17,18,19

Chevron U.S.A. Inc. v. Natural Res. Def. Council,
    467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Gardebring v. Jenkins,
    485 U.S. 415 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Goodman v. Mead Johnson & Co.,
    534 F.2d 566 (3d Cir. 1976),
    *cert denied*, 429 U.S. 1038 (1977) . . . . . . . . . . . . . . . . . . . . . .  10

Heckler v. Chaney,
    470 U.S. 821 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Horizons Int'l, Inc. v.Baldrige,
    811 F.2d 154 (3d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . .  3,11

Kolbusz-Kijne v. Technical Career Inst.,
    1993-LCA-4 (Sec'y July 18, 1994) . . . . . . . . . . . . . . . . . . . . .  9-10,25

Lehigh Valley Manpower Program v. Donovan,
    718 F.2d 99 (3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Libbey Glass, Div. of Owens-Ill., Inc. v. United States,
    921 F.2d 1263 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . .  27

*CASES -- continued:*                                                                 Page

    Mohasco Corp. v. Silver,
        447 U.S. 807 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        18

    Morrison v. Madison Dearborn Capital Partners III L.P.,
        463 F.3d 312 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . .        12

    Natural Res. Def. Council, Inc. v. United States E.P.A.,
        790 F.2d 289 (3d Cir. 1986),
        *cert. denied sub nom.* Chicago Ass'n of Commerce &
        Indus. v. Natural Res. Def. Council, Inc.,
        479 U.S. 1084 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        11

    NVE, Inc. v. Department of Health & Human Servs.,
        436 F.3d 182 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . .        3,11

    OPM v. Richmond,
        496 U.S. 414 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        20

    Pauley v. BethEnergy Mines, Inc.,
        501 U.S. 680 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        12

    Shell Oil Co. v. Babbitt,
        945 F. Supp. 792 (D. Del. 1996),
        *aff'd,* 125 F.3d 172 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . .        11-12

    Shenango Inc. v. Apfel,
        307 F.3d 174 (3d Cir. 2002),
        *cert. denied,* 539 U.S. 958 (2003) . . . . . . . . . . . . . . . . . . . . . .        18,19

    Southwestern Pa. Growth Alliance v. Browner,
        121 F.3d 106 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . .        18,19

    Southern Pa. Transp. Auth. v. Pennsylvania Pub. Util. Comm'n,
        826 F. Supp. 1506 (E.D. Pa. 1993),
        *aff'd mem.,* 27 F.3d 558 (3d Cir.),
        *cert. denied*, 513 U.S. 928 (1994) . . . . . . . . . . . . . . . . . . . . . .        11

    Suburban Trust & Sav. Bank v. University of Del.,
        910 F. Supp. 1009 (D. Del. 1995) . . . . . . . . . . . . . . . . . . . . . .        11

    Thomas Jefferson Univ. v. Shalala,
        512 U.S. 504 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        12

*CASES -- continued:*                                                                  Page

United States v. Cleveland Indians Baseball Co.,
        532 U.S. 200 (2001)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        12

United States v. James Daniel Good Real Prop.,
        510 U.S. 43 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        18,19

United States v. Montalvo-Murillo,
        495 U.S. 711 (1990)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        18

United States Dep't of Labor v. Beverly Enters., Inc.,
        ARB Case No. 99-050 (July 31, 2002)  . . . . . . . . . . . . . . . . . .        19

United States Dep't of Labor v. Nurses PRN,
        ARB No. 97-131, ALJ No. 94-ARN-1 (June 30, 1999) . . . . . . . .        7

Utah Power & Light Co. v. United States,
        243 U.S. 389 (1917)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        20

Williams v. Philadelphia Hous. Auth.,
        834 F. Supp. 794 (E.D. Pa. 1993),
        *aff'd mem.,* 27 F.3d 560 (3d Cir. 1994)  . . . . . . . . . . . . . . . . . .        11

*STATUTES:*

Administrative Procedure Act,
        5 U.S.C. 551 *et seq.:*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        10

        5 U.S.C. 556  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        17

        5 U.S.C. 701(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        28

        5 U.S.C. 702  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        10

        5 U.S.C. 706(2)(A)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        3,11

        5 U.S.C. 706(2)(E)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .        3,11

American Competitiveness and Workforce Improvement Act of 1998,
        Pub. L. 105-277, 112 Stat. 2681 . . . . . . . . . . . . . . . . . . . . . . .        1-2,26

American Competitiveness in the Twenty-first Century Act of 2000,
        Pub. L. No. 106-313, 114 Stat. 1251 . . . . . . . . . . . . . . . . . . . .        13

*STATUTES -- continued:*                                                                  *Page*

Civil Rights Act of 1964,
    tit. VII, 42 U.S.C. 2000e *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . .    18

Homeland Security Act of 2002,
    Pub. L. No. 107-296, 116 Stat. 2135 . . . . . . . . . . . . . . . . . . . .    14

Immigration Act of 1990,
    Pub. L. No. 101-649, 104 Stat. 4978 . . . . . . . . . . . . . . . . . . . .    13

Immigration and Nationality Act,
    8 U.S.C. 1101 *et seq.*:

    Section 101(a)(15)(H)(i)(b), 8 U.S.C. 1101(a)(15)(H)(i)(b) . . . . .    1,3,12,14

    Section 204, 8 U.S.C. 1154 . . . . . . . . . . . . . . . . . . . . . . . . . .    16,17

    Section 212(n), 8 U.S.C. 1182(n) . . . . . . . . . . . . . . . . . . . . . .    1,3,8,13,29

    Section 212(n)(1), 8 U.S.C. 1182(n)(1) . . . . . . . . . . . . . . . . . .    13,14,16

    Section 212(n)(1)(A), 8 U.S.C. 1182(n)(1)(A) . . . . . . . . . . . . .    13,14

    Section 212(n)(1)(E), 8 U.S.C. 1182(n)(1)(E) . . . . . . . . . . . . .    15

    Section 212(n)(1)(E)(i), 8 U.S.C. 1182(n)(1)(E)(i) . . . . . . . . . .    15

    Section 212(n)(1)(E)(ii), 8 U.S.C. 1182(n)(1)(E)(ii) . . . . . . . . .    15

    Section 212(n)(1)(F), 8 U.S.C. 1182(n)(1)(F) . . . . . . . . . . . . .    7 & passim

    Section 212(n)(1)(G), 8 U.S.C. 1182(n)(1)(G) . . . . . . . . . . . . .    15

    Section 212(n)(1)(G)(i)(I), 8 U.S.C. 1182(n)(1)(G)(i)(I) . . . . . . .    15

    Section 212(n)(1)(G)(i)(II), 8 U.S.C. 1182(n)(1)(G)(i)(II) . . . . . .    16

    Section 212(n)(2), 8 U.S.C. 1182(n)(2) . . . . . . . . . . . . . . . . . .    14

    Section 212(n)(2)(A), 8 U.S.C. 1182(n)(2)(A) . . . . . . . . . . . . .    14,17

    Section 212(n)(2)(B), 8 U.S.C. 1182(n)(2)(B) . . . . . . . . . . . . . .    3,6,17

    Section 212(n)(2)(C), 8 U.S.C. 1182(n)(2)(C) . . . . . . . . . . . . . .    14,17,25

*STATUTES -- continued:*                                                          *Page*

     Section 212(n)(2)(C)(i), 8 U.S.C. 1182(n)(2)(C)(i) . . . . . . . . . .    7

     Section 212(n)(2)(C)(i)(I), 8 U.S.C. 1182(n)(2)(C)(i)(I) . . . . . . .    9,16,25,26,29

     Section 212(n)(2)(C)(i)(II), 8 U.S.C. 1182(n)(2)(C)(i)(II) . . . . . .    9,16,25

     Section 212(n)(2)(D), 8 U.S.C. 1182(n)(2)(D) . . . . . . . . . . . . .    14

     Section 212(n)(3)(A), 8 U.S.C. 1182(n)(3)(A) . . . . . . . . . . . .    15

     Section 214(c), 8 U.S.C. 1184(c) . . . . . . . . . . . . . . . . . . . .    16,17

     Section 214(i)(1), 8 U.S.C. 1184(i)(1) . . . . . . . . . . . . . . . . . .    13

L-1 Visa and H-1B Visa Reform Act of 2004,
     Pub. L. No. 108-447, tit. IV, 188 Stat. 3351 . . . . . . . . . . . . . .    15

Miscellaneous and Technical Immigration and Naturalization
     Amendments of 1991,
     Pub. L. No. 102-232, 105 Stat. 1733 . . . . . . . . . . . . . . . . . . .    13

*CODE OF FEDERAL REGULATIONS*:

20 C.F.R:

     Part 655 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2,8

     Subpart H: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    2

          Sections 655.700 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . .    14

          Section 655.700(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . .    14

          Section 655.705(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . .    16

          Section 655.736 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

          Section 655.736(g)(4) . . . . . . . . . . . . . . . . . . . . . . . . . .    15

          Section 655.737 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    5

          Section 655.737(e)(3) . . . . . . . . . . . . . . . . . . . . . . . . . .    5

*CODE OF FEDERAL REGULATIONS -- continued:*                    *Page*

Section 655.738 . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2,8,15,16,30

Section 655.738(c) . . . . . . . . . . . . . . . . . . . . . . . . .     9

Section 655.738(d) . . . . . . . . . . . . . . . . . . . . . . . . .     22,23

Section 655.738(d)(2)(ii) . . . . . . . . . . . . . . . . . . . . .     16

Section 655.738(d)(3) . . . . . . . . . . . . . . . . . . . . . . .     22

Section 655.738(d)(4) . . . . . . . . . . . . . . . . . . . . . . .     5

Section 655.738(d)(5) . . . . . . . . . . . . . . . . . . . . . . .     9,21,30

Section 655.738(d)(5)(i) . . . . . . . . . . . . . . . . . . . . .     23,25

Section 655.739 . . . . . . . . . . . . . . . . . . . . . . . . . . .     15

Subpart I: . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     2

Section 655.805 . . . . . . . . . . . . . . . . . . . . . . . . . . .     28

Section 655.806(a)(3) . . . . . . . . . . . . . . . . . . . . . . .     6

Section 655.810(a) . . . . . . . . . . . . . . . . . . . . . . . . .     14

Section 655.810(b) . . . . . . . . . . . . . . . . . . . . . . . . .     14

Section 655.810(b)(1)(i) . . . . . . . . . . . . . . . . . . . . . .     8,30

Section 655.810(b)(1)(i)-(iii) . . . . . . . . . . . . . . . . . . .     17

Section 655.810(c) . . . . . . . . . . . . . . . . . . . . . . . . .     26

Section 655.810(d) . . . . . . . . . . . . . . . . . . . . . . . . .     7,8,23,29

Section 655.810(d)(1) . . . . . . . . . . . . . . . . . . . . . . .     17,28,30

Section 655.810(f) . . . . . . . . . . . . . . . . . . . . . . . . . .     7,8,30

Section 655.815(c) . . . . . . . . . . . . . . . . . . . . . . . . .     28,29

Section. 655.855 . . . . . . . . . . . . . . . . . . . . . . . . . . .     17,29

*CODE OF FEDERAL REGULATIONS -- continued:*                                     *Page*

        Section 655.855(a) . . . . . . . . . . . . . . . . . . . . . . . . . . .    7,8,29

*MISCELLANEOUS*:

    144 Cong. Rec. S10878 (Sept. 24, 1998) . . . . . . . . . . . . . . . . . . .    27

    144 Cong. Rec. S12751 (Oct. 21, 1998) . . . . . . . . . . . . . . . . . . .    24

    65 Fed. Reg. (Dec. 20, 2000):

        p. 80110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4,15

        pp. 80140-43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    4,15

        p. 80144 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    27

        p. 80150 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

        p. 80151 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    23

        pp. 80150-51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

        pp. 80187-88 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    24

    Fed. R. C. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

    H.R. Rep. No. 692, 106th Cong., 2d Sess. (2000) . . . . . . . . . . . . . . .    13

This Brief in Support of Defendants' Motion for Summary Judgment is filed on behalf of Elaine L. Chao, Secretary of Labor ("Secretary") and all other Defendants, by their attorneys, Colm F. Connolly, United States Attorney for the District of Delaware, and Seth M. Beausang, Assistant United States Attorney for the District of Delaware.  As shown below, because there were no disputed issues of material facts, the decision of the Department of Labor's Administrative Review Board ("Board") was correct as a matter of law, and therefore this Court should grant the defendants' motion for summary judgment.

## NATURE AND STAGE OF THE PROCEEDINGS

This case arises under the Immigration and Nationality Act ("INA"), 8 U.S.C. 1101(a)(15)(H)(i)(b); 1182(n), as amended by the American Competitiveness and Workforce Improvement Act of 1998 ("ACWIA"), Pub. L. 105-277, 112 Stat. 2681, and the applicable regulations at 20 C.F.R. 655, Subparts H and I.   On March 20, 2003, the Administrator of the Department of Labor's Wage and Hour Division ("Administrator") issued a Determination Letter to Cyberworld Enterprise Technologies, Inc. d/b/a Tekstrom ("Cyberworld/Tekstrom") in which it was determined that, pursuant to 20 C.F.R. 655.738, Cyberworld/Tekstrom had failed to make the required displacement inquiries of other employers at worksites where H-1B nonimmigrant workers were placed (*see* Certified Administrative Record ("AR"), attached hereto as Exhibit D, at 1-2, 4). The Administrator assessed a civil money penalty ("CMP") of $3,400 and informed Cyberworld/Tekstrom that the Attorney General ("AG") would be notified in order to impose the sanction of debarment on the company for a period of at least one year (*Id.*). Cyberworld/Tekstrom requested a hearing (AR at 36-39).

On September 25, 2003, an Administrative Law Judge ("ALJ"), in relevant part,
rejected Cyberworld/Tekstrom's "agency delay defense" (AR at 288-96). On October 30,
2003, the parties filed cross-motions for summary judgment (AR at 98-325; 370-86),
after which they filed a Joint Stipulation of Undisputed Facts (AR at 388-95). The ALJ's
Initial Decision and Order was issued on December 23, 2003 (AR at 624-48).

The Final Decision and Order of the Board was issued on May 24, 2006 (AR at
809-48). In this decision, the Board affirmed the conclusions of the ALJ because the ALJ
"correctly applied the relevant statutes, regulations, and case precedent. His decisions are
thorough and well reasoned" (AR at 811). The Board therefore attached and incorporated
the ALJ's December 23, 2003 Initial Decision and Order and his September 25, 2003
Denial of Respondent's Cross-Motion for Summary Decision, Denial of Motion to
Compel, Continuance Order (AR at 809-48). This petition for review followed.

## SUMMARY OF THE ARGUMENT

1.    Defendants are entitled to summary judgment because there are no disputed
material facts and the Board's decision, which was correct on the legal issues, should be
affirmed.

2.    This case, which involves review under the H-1B provisions, 8 U.S.C.
1101(A)(15)(H)(i)(b) and 1182(n), is governed by the Administrative Procedure Act
("APA"); therefore the Board's decision must be affirmed if supported by substantial
evidence and not "arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law." 5 U.S.C. 706(2)(A), (E).

3.    Further, the case is before this Court for review of the agency determination , and,
in accordance with the APA, this Court's review is limited to the record made before the

2

agency.  *See* <u>NVE, Inc. v. Department of Health & Human Servs.</u>, 436 F.3d 182, 189-90 (3d Cir. 2006) (quoting <u>Horizons Int'l, Inc. v. Baldrige</u>, 811 F.2d 154, 162 (3d Cir. 1987)).

4.      Because the parties entered into a Joint Stipulation of Facts, which was relied upon by the Board and the ALJ, there are no factual issues to be resolved, and Defendants are entitled to summary judgment based upon the undisputed facts.

5.      The statutory time limit at 8 U.S.C. 1182(n)(2)(B) is directory, rather than mandatory, and therefore the Secretary maintained jurisdiction when the investigation was not completed within 30 days.   *See infra* at 18-20 and cases cited therein.

6.      Moreover, Defendants are entitled to summary judgment because Cyberworld/Tekstrom failed to show that it was prejudiced by the delay, since it acknowledged its violations at the outset.

7.      Defendants are entitled to summary judgment because Cyberworld/Tekstrom acknowledged that its failure to inquire whether its secondary employers had displaced or intended to displace any United States workers within the relevant period was a violation of the H-1B provisions.

8.      Debarment under the H-1B statute and regulations is mandatory when an employer fails to make the displacement inquiry of its secondary employers, as reflected in the statute, the regulations, the legislative history and the Preamble to the regulations. *See, e.g.,* Preamble to the Interim Final Rule ("Preamble"), 65 Fed. Reg. 80110, 80140-43 (Dec. 20, 2000); *see also infra* at 16-17, 25-29.

## STATEMENT OF FACTS

A.    Facts.

The ALJ's factual findings were largely based on the parties' Joint Stipulation (AR 388-95).  Cyberworld/Tekstrom is engaged in computer software development, consulting, and providing computer maintenance service, for which it recruits and employs skilled computer professionals (AR at 633).  On 14 Labor Condition Applications ("LCAs"), which were submitted to and approved by the Department of Labor between January 19, 2001 and October 1, 2002, Cyberworld/Tekstrom's then-President, Mr. Suresh Kakkirala, stated that Cyberworld/Tekstrom is an H-1B-dependent employer (*Id.*).  The LCAs did not indicate that any of the nonimmigrants were "exempt" (*Id.*).[1]  On the LCAs, Cyberworld/Tekstrom agreed to comply with the primary attestations, relating to wages, working conditions, strikes or lockouts, and notice to any union and other workers, and also -- as an H-1B-dependent employer -- with the additional labor condition requirements, which include nondisplacement of United States workers in another employer's workforce (*Id.*).

During this period, Cyberworld/Tekstrom contracted with various vendors to use the services of the 14 nonimmigrant employees (AR at 633).[2]   In turn, the vendors placed the H-1B workers with their respective client businesses at the clients' worksites

---

[1] In order to qualify as "exempt," an employee must receive an annual salary of at least $60,000 or have a master's or higher education degree in a specialty related to the intended employment.  20 C.F.R. 655.737.  Of the 14 H-1B nonimmigrants, 12 may have qualified (AR at 634).  However, by failing to list as exempt those employees who appeared to qualify, Cyberworld/Tekstrom waived the exemption from being required to make the displacement inquiry (*see* 20 C.F.R. 655.737(e)(3)) for those employees (AR at 625-26).

[2] From August 6, 2001 to March 9, 2002, Cyberworld/Tekstrom placed one of these H-1B nonimmigrant workers with one of its own clients (*Id.*).

(*Id.*).  At each of the worksites, the H-1B nonimmigrant worker's working conditions had the indicia of an employment relationship with the client business, which included the client business' rights to discharge the H-1B worker, to assign work, and to control the manner, method, and duration of the work; the H-1B workers also used the client business' equipment and supplies at each worksite (*Id.*).

Cyberworld/Tekstrom never inquired whether the vendors, the vendors' clients, or its own client business displaced or intended to displace any similarly employed United States worker beginning 90 days before and ending 90 days after the H-1B nonimmigrant's placement (*see* 20 C.F.R. 655.738(d)(4)) (AR at 633). Cyberworld/Tekstrom failed to obtain any assurances from either the vendors or its business client that there would be no displacement of United States workers (*Id.* at 633-34).  Moreover, Cyberworld/Tekstrom did not inquire of its vendors whether they sought such assurances from their client businesses at which H-1B nonimmigrant workers had been placed (*Id.* at 634).  And, none of Cyberworld/Tekstrom's contracts with either its client business or any of its vendors included clauses requiring that no displacement of United States workers would occur, or requiring that the vendor seek such assurances from those businesses at which the H-1B nonimmigrant workers were placed (*Id.*).

The investigation of Cyberworld/Tekstrom covered the period of the placement of the 14 H-1B nonimmigrant workers (AR at 634).  The investigation revealed that Cyberworld/Tekstrom failed to make the required secondary displacement inquiries (*Id.*). Wage-Hour determined that a CMP of $3,400 was appropriate for the violations, and that a one-year debarment was mandated (*Id.* at 635).

B.    Decisions of the ALJ.

1.  On September 25, 2003, the ALJ rejected Cyberworld/Tekstrom's jurisdictional defense that the Administrator's action was barred as untimely (AR at 288-96).  At issue was whether the Administrator was foreclosed from proceeding against Cyberworld/Tekstrom because she failed to comply with the statutory and regulatory provisions providing for the issuance of a determination within 30 days of the filing of a complaint (AR at 289).  *See* 8 U.S.C. 1182(n)(2)(B); 20 C.F.R. 655.806(a)(3).

The ALJ concluded that, because the H-1B statute attaches no consequence to a failure to meet the 30-day investigative time period, and because there was no relevant legislative history suggesting that the action should not go forward in these circumstances, the 30-day time period for investigation is not mandatory and the Administrator therefore maintained jurisdiction to proceed.  The ALJ concluded that the question was readily answered (AR at 293-94).  *See* United States Dep't of Labor v. Nurses PRN of Denver, ARB No. 97-131, ALJ No. 94-ARN-1 (June 30, 1999) (Ex. C),[3] slip op. at 8 (citing Brock v. Pierce County, 476 U.S. 253, 266 (1986)).

2.  The ALJ concluded that Cyberworld/Tekstrom had violated the H-1B statute, *see* 8 U.S.C. 1182(n)(1)(F), in 14 instances by failing to make the required displacement inquiry of the secondary employers (and its own client), as it had attested on the LCAs it would do, or by taking any other steps to ensure that no improper displacement was intended or had occurred (AR at 633-34).

The ALJ rejected each of Cyberworld/Tekstrom's defenses.  First, he found that the absence of any reference in section 655.810(f), 20 C.F.R. 655.810(f), to the particular

---

[3] Cited administrative cases are attached as Exhibits A, B, & C to this Brief.

violation committed by Cyberworld/Tekstrom did not alter the requirement that the

Administrator notify the AG to disqualify Cyberworld/Tekstrom (AR at 635).[4]  In this

regard, the ALJ, although noting that the proper reference in section 655.855(a) should

have been to section 655.810(d) (referring to displacement), identified two reasons for his

conclusion that the flawed regulation at section 655.855(a) did not preclude referral to the

AG: (1) because the statute, at 8 U.S.C. 1182(n)(2)(C)(i), directs the Administrator to

make the referral to the AG for an employer's failure to inquire about the displacement of

United States workers, the incorrect internal regulation (described by the ALJ as an

"administrative error") did not invalidate the statute's clear language; and (2) the incorrect

reference to section 655.810(f) in section 655.855(a) had a *de minimis* effect because it

was not the only place in Part 655 that directs the Administrator to notify the AG of a

violation (including one for displacement, *see* 20 C.F.R. 655.810(d)); therefore section

655.855(a) does not serve as the "enabling provision" for notification of the AG (AR at

635-36).

        The second defense rejected by the ALJ was that, since the Administrator failed to

cite section 655.810(d) in the determination letter, she lacked the authority to initiate a

debarment procedure because Cyberworld/Tekstrom had insufficient notice (AR at 635-

36).  The ALJ, however, determined that Cyberworld/Tekstrom had sufficient notice

because, in addition to reference to the statute, 8 U.S.C. 1182(n), the remedies specified

in the determination letter for "fail[ure] to make the required displacement inquiry of the

secondary employer" included both the $3,400 CMP and notice that

---

[4] Section 655.855(a), 20 C.F.R. 655.855(a), requires notification to the AG of violations
identified in section 655.810(f).  Section 655.810(f), in turn, does not discuss any
violations.

Cyberworld/Tekstrom would be referred to the AG for debarment (*Id.*).  The ALJ observed that Cyberworld/Tekstrom based its hearing request only on the fact that the one-year debarment penalty would be "out of proportion," and that it was not until the filing of the motion for summary judgment that Cyberworld/Tekstrom suggested any confusion on its part about the Administrator's authority to refer the company to the AG for debarment (*Id.*).

The ALJ also rejected Cyberworld/Tekstrom's claim that, because section 655.810(b)(1)(i) (referred to in section 655.810(d) and referring in turn to section 655.738) specifies the actual displacement of United States workers, and Cyberworld/Tekstrom's violation involved the failure to make displacement inquiries, the one-year debarment should not apply (AR at 636-37).  The ALJ concluded that CMPs and the debarment sanction are based on the statute at section 1182(n)(2)(C)(i)(I) and (II), which incorporates those penalties for both actual displacement and the failure to make the displacement inquiry required under section 8 U.S.C. 1182(n)(1)(F) (*Id*. at 637).  He also cited the regulations to show that they, too, incorporate the obligation to make secondary displacement inquiries (20 C.F.R. 655.738(d)(5)), as well as the prohibition against direct displacements (20 C.F.R. 655.738(c)) (*Id.*).

Cyberworld/Tekstrom  also argued that knowledge of displacement is an essential feature of an H-1B- dependent employer's liability for the violation, and that it had no such knowledge (AR at 637-38).  The ALJ concluded that section 1182(n)(1)(F) of the statute, which requires that the inquiry be made, has no knowledge element (*Id.* at 641).  Thus, Cyberworld/Tekstrom's defense of lack of knowledge was rejected by the ALJ (*Id.*).

8

Finally, the ALJ addressed whether the Secretary is required to refer Cyberworld/Tekstrom to the AG for debarment (AR at 641-42).  Acknowledging that Cyberworld/Tekstrom presented a strong mitigation case, i.e., that no United States worker or H-1B nonimmigrant was adversely affected by its failure to make the inquiry, that it had cooperated in the investigation, and that it had taken actions to ensure future compliance, the ALJ nevertheless concluded that the Secretary lacks discretion to forego notification to the AG for the one-year debarment (*Id.* at 642).  In support of this determination, the ALJ relied on the mandatory term "shall" in section 1182(n)(2)(C)(i)(I), and the statutory emphasis on protecting United States workers in the scheme of sanctions (*Id.* at 642-44).  For these reasons, the ALJ found insufficient reasons to depart from the Secretary's interpretation in Kolbusz-Kijne v. Technical Career Institute, 1993-LCA-4 (Sec'y July 18, 1994) (Ex. A) (reduction of CMPs in H-1B case because of mitigating factors, but nevertheless supporting the reporting of the violation -- substantially failing to provide notice of the filing of the LCA, and filing an LCA which misrepresented a material fact -- to the AG) (AR at 644-45).  Accordingly, the ALJ affirmed the Administrator's decision as set forth in the determination letter -- $3,400 in CMPs and notification to the AG of the violations for purposes of a one-year debarment (*Id.* at 645).

## ARGUMENT

### I.    STANDARD OF REVIEW.

A.  Summary Judgment.

Summary judgment is proper when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, the Court must look to the substantive law that supports the movant's claims to determine which facts are "material" and whether a "genuine issue" exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The purpose of the rule is to eliminate a trial in cases where it is unnecessary and would only cause delay and expense.  Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038 (1977).  In this case, during the administrative process, the parties executed a joint stipulation of facts and filed cross-motions for summary judgment.  Further, the case is before the Court for review of the agency determination pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. 551 et seq.  APA review is limited to the record made before the agency.  5 U.S.C. 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.") (emphases added); see NVE, Inc. v. Department of Health & Human Servs., 436 F.3d 182, 189-90 (3d Cir. 2006) (quoting Horizons Int'l, Inc. v. Baldrige, 811 F.2d 154, 162 (3d Cir. 1987).  Accordingly, there is no dispute with regard to the material facts.

The standards for summary judgment do not change where both sides have moved for summary judgment.  Suburban Trust & Sav. Bank v. University of Del., 910 F. Supp.

1009, 1012-13 (D. Del. 1995) (citing <u>Southern Pa. Transp. Auth. v. Pennsylvania Pub.</u>

<u>Util. Comm'n</u>, 826 F. Supp. 1506, 1512 (E.D. Pa. 1993), *aff'd mem.* 27 F.3d 558 (3d Cir.),

*cert denied*, 513 U.S. 928 (1994)).  The Court must consider the motions independently.

<u>Suburban Trust</u>, 910 F. Supp. at 1013 (citing <u>Williams v. Philadelphia Hous. Auth.</u>, 834

F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd mem.,* 27 F.3d 560 (3d Cir. 1994)).

     B.  <u>Judicial Review of Agency Proceedings.</u>

     Judicial review under the H-1B provisions is governed by the APA.  Accordingly,

the Board's decision must be affirmed if it is supported by substantial evidence and is not

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5

U.S.C. 706(2)(A), (E).  *See* <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>,

419 U.S. 281, 285-86 (1974) ("While we may not supply a reasoned basis for the

agency's action that the agency itself has not given . . . we will uphold a decision of less

than ideal clarity if the agency's path may reasonably be discerned."); <u>Natural Res. Def.</u>

<u>Council, Inc. v. United States E.P.A.</u>, 790 F.2d 289, 297-98 (3d Cir. 1986), *cert. denied*

*sub nom.* <u>Chicago Ass'n of Commerce & Indus. v. Natural Res. Def. Council, Inc.</u>, 479

U.S. 1084 (1987) . In <u>Shell Oil Co. v. Babbitt</u>, 945 F. Supp. 792 (D. Del. 1996), *aff'd*, 125

F.3d 172 (1997), this Court stated that, when it reviews a challenge to the Secretary's

legal determinations, it relies on <u>Chevron U.S.A. Inc. v. Natural Res. Def. Council</u>, 467

U.S. 837, 842-43 (1984), for the well-settled principle that where a statute is silent or

ambiguous as to the specific issue, the agency's answer is to be upheld if it is based on a

permissible construction of the statute.  945 F. Supp. at 798.   Moreover, an agency's

interpretation of its own rules is given similar deference.  *Id.* (citing <u>Thomas Jefferson</u>

<u>Univ. v. Shalala</u>, 512 U.S. 504, 512 (1994)) (other citations omitted).  In <u>Thomas</u>

11

Jefferson University,  the Supreme Court stated that a court must defer to the agency's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation."  512 U.S. at 512 (quoting Gardebring v. Jenkins, 485 U.S. 415, 430 (1988)).  Moreover, deference is especially warranted where, as here, the regulation concerns "a complex and highly technical regulatory program," in which the identification and classification of relevant criteria "necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns."  Thomas Jefferson Univ., 512 U.S. at 512 (quoting Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991)); *see also* Morrison v. Madison Dearborn Capital Partners III L.P., 463 F.3d 312, 315 (3d Cir. 2006) (citing United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 219 (2001)).

## II.     STATUTORY AND REGULATORY FRAMEWORK.

The H-1B visa program is a voluntary program that permits employers to secure and employ nonimmigrants on a temporary basis to fill specialized jobs in the United States.  *See* 8 U.S.C. 1101(a)(15)(H)(i)(b).  The INA requires that an employer pay an H-1B nonimmigrant the higher of its actual wage or the locally prevailing wage.  *See* 8 U.S.C. 1182(n)(1)(A).  The prevailing wage provisions safeguard against the erosion of United States workers' wages and moderate any economic incentive or advantage in hiring temporary foreign workers.  *See, e.g.*, H.R. Rep. No. 692, 106th Cong., 2d Sess. (2000); (discussion of the Labor Department's 1996 Office of Inspector General report).

Under the INA as amended,[5] an employer seeking to hire an alien in a specialty

occupation,[6] or as a fashion model of distinguished merit and ability, must seek and get

permission from the Department of Labor, by submitting an LCA, before the alien may

obtain an H-1B visa.  *See* 8 U.S.C. 1182(n)(1).

    In its LCA application to the Labor Department, an employer attests that:

        (A)  The employer --

            (i) is offering and will offer [the H-1B worker] during the period of
        authorized employment . . . wages that are at least --

                (I) <u>the actual wage level</u> paid by the employer to all other
                individuals with similar experience and qualifications for
                the specific employment in question, or

                (II) <u>the prevailing wage level</u> for the occupational
                classification in the area of employment,

    <u>whichever is greater</u>, based on the best information available as of the time of
    filing the application.

8 U.S.C. 1182(n)(1)(A) (emphases added).

    The Department of Labor is required to certify the LCA within seven days unless

it is incomplete or contains "obvious inaccuracies."  8 U.S.C. 1182(n)(1), unmarked

paragraph preceding 8 U.S.C. 1182(n)(2).  Only after the employer receives the Labor

---

[5] Section 212(n) of the INA, 8 U.S.C. 1182(n), was amended by the Immigration Act of
1990, Pub. L. No. 101-649, 104 Stat. 4978; the ACWIA; the Miscellaneous and
Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232,
105 Stat. 1733; and the American Competitiveness in the Twenty-first Century Act of
2000, Pub. L. No. 106-313, 114 Stat. 1251.

[6] The INA defines a "specialty occupation" as an occupation requiring the application of
highly specialized knowledge and the attainment of a bachelor's degree or higher.  *See* 8
U.S.C. 1184(i)(1).

Department's certification, may the Immigration and Naturalization Service ("INS")[7]

approve an H-1B petition seeking authorization to employ a specific nonimmigrant

worker.  *See* 8 U.S.C. 1101(a)(15)(H)(i)(b); 20 C.F.R. 655.700(a)(3).

The statute also prescribes a framework for enforcement proceedings and

sanctions, directing the Department of Labor to

> establish a process for the receipt, investigation, and disposition of
> complaints respecting a petitioner's failure to meet a condition specified in
> an application submitted under [this Act] or a petitioner's
> misrepresentation of material facts in such an application.  Complaints
> may be filed by any aggrieved person or organization (including
> bargaining representatives). . . . The Secretary shall conduct an
> investigation under this paragraph if there is reasonable cause to believe
> that such a failure or misrepresentation has occurred.

8 U.S.C. 1182(n)(2)(A).  The Department of Labor has promulgated regulations which

provide detailed guidance regarding the determination, payment, and documentation of

the required wages.  *See* 20 C.F.R. 655.700 *et seq.*  Remedies for violations of the statute

or regulations include payment of back wages to H-1B workers.  *See* 8 U.S.C.

1182(n)(2)(D); 20 C.F.R. 655.810(a).  CMPs may also be assessed for certain violations

(including, as discussed below, the failure to inquire about the displacement of United

States workers).  *See* 8 U.S.C. 1182(n)(2)(C); 20 C.F.R. 655.810(b).

The Secretary's authority to interpret and enforce the employer's LCA obligations

includes the ACWIA requirements that H-1B-dependent employers[8] and willful violators

---

[7] Pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135,
2195-97, the adjudication of immigrant visa petitions was transferred from the INS to the
U.S. Citizenship and Immigration Services ("USCIS").

[8] The term "H-1B-dependent employer" is defined in both the statute and the regulations.
8 U.S.C. 1182(n)(3)(A); 20 C.F.R. 655.736; *see also* 8 U.S.C. 1182(n)(1)(E)(ii).  The
definition is based on a formula for comparing the number of H-1B nonimmigrants

comply with certain additional LCA attestations regarding anti-displacement and recruitment obligations.[9]  *See* 8 U.S.C. 1182(n)(1)(E), (F), (G); 20 C.F.R. 655.738, 655.739; Preamble to the Interim Final Rule ("Preamble"), 65 Fed. Reg. 80110, 80140-43 (Dec. 20, 2000).  These additional attestations are that the employer (1) did not displace and will not displace a United States worker within the period beginning 90 days before, and ending 90 days after, the date of the filing of any visa petition supported by the LCA, 8 U.S.C. 1182(n)(1)(E)(i); (2) will not place the nonimmigrant with certain other employers unless an inquiry has been made as to whether the other employer has displaced or intends to displace a United States worker during the period 90 days before or after the placement of the H-1B worker, 8 U.S.C. 1182(n)(1)(F); (3) has taken good faith steps to recruit United States workers for the jobs for which the H-1B workers are sought, 8 U.S.C. 1182(n)(1)(G)(i)(I); and (4) has offered the job to any United States worker who applies and is equally or better qualified than the nonimmigrant 8 U.S.C. 1182(n)(1)(G)(i)(II).  These additional LCA attestations for H-1B-dependent employers

> impose certain obligations to recruit U.S. workers, to offer the job to U.S. applicants who are equally or better qualified than the H-1B nonimmigrant(s) sought for the job, and to avoid the displacement of U.S. workers (either in the employer's workforce, or in the workforce of a

---

employed with the number of full-time-equivalent employees in the employer's workforce.

[9] On October 1, 2003, the special attestation requirements at issue in this case sunset and were not in effect for LCAs filed after that date, until they were reinstated (and made retroactive) by the L-1 Visa and H-1B Visa Reform Act of 2004, Pub. L. No. 108-447, tit. IV, 118 Stat. 3351-61, effective March 8, 2005.  However, the employer's obligations under the special attestations remained in effect for LCAs filed prior to the sunset date, so long as any H-1B nonimmigrant remained employed pursuant to that LCA.  *See* 20 C.F.R. 655.736(g)(4).  These provisions were in effect during the relevant period in this case, because all the events at issue had occurred prior to the sunset date.

second employer with whom the H-1B nonimmigrant(s) is placed, where there are indicia of employment with a second employer).

20 C.F.R. 655.705(c)(1) (citation omitted).[10]

An H-1B-dependent employer's failure to make the displacement inquiry of a secondary or other employer before placement of an H-1B worker is a violation which requires at least a one-year debarment by the AG.  *See* 8 U.S.C. 1182(n)(2)(C)(i)(I), (II). The statute states:

> If the Secretary finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1)(b), (1)(e), or (1)(f) . . . --
>
> (I)  the Secretary <u>shall</u> notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil money penalties in an amount not to exceed $1,000 per violation) as the Secretary determines to be appropriate; and
>
> (II)  the Attorney General <u>shall not</u> approve petitions filed with respect to that employer under section 204 or 214(c) of this title during a period of at least 1 year for aliens to be employed by the employer.

8 U.S.C. 1l82(n)(2)(C)(i) (emphases added).  The regulations also provide that the mandatory penalty for violation of the displacement prohibitions of section 655.738, including making secondary inquiries, is at least a one-year debarment.  The regulation states:

> The Administrator <u>shall</u> notify the Attorney General pursuant to §655.855 that the employer <u>shall</u> be disqualified from approval of any petitions filed by, or on behalf of, the employer pursuant to section 204 or section 214(c) of the INA for the following periods:

---

[10] Indicia of such an employment relationship between the nonimmigrant and the secondary/other employer include the business' right to fire the H-1B nonimmigrant worker, to assign work, to control the manner, method, and duration of the work; and, in addition, the work is to be performed at the business' worksite and the business furnishes the equipment and supplies.  *See* 20 C.F.R. 655.738(d)(2)(ii).

(1)  At least one year for violation(s) of any of the provisions
specified in paragraph (b)(1)(i) [displacement] through (iii) of this
section.

20 C.F.R. 655.810(d)(1) (emphases added).

### III.    BECAUSE THE USE OF THE WORD "SHALL" TO SET TIME LIMITS IN THE APPLICABLE STATUTORY AND REGULATORY PROVISIONS IS DIRECTORY RATHER THAN MANDATORY, THE SECRETARY IS NOT REQUIRED TO COMPLETE AN INVESTIGATION IN 30 DAYS IN ORDER TO MAINTAIN JURISDICTION.

As noted above, the H-1B statute provides that the Secretary is to establish a

process for the receipt, investigation, and disposition of complaints of LCA violations.  8

U.S.C. 1182(n)(2)(A).  The statute further provides that:

[T]he Secretary shall provide, within 30 days after the date such a
complaint is filed, for a determination as to whether or not a reasonable
basis exists to make a finding described in subparagraph (C).  If the
Secretary determines that such a reasonable basis exists, the Secretary
shall provide for notice of such determination to the interested parties and
an opportunity for a hearing on the complaint, in accordance with section
556 of title 5, United States Code, within 60 days after the date of the
determination. . . .

8 U.S.C. 1182(n)(2)(B).  However, this provision does not establish any consequence for

the failure to meet this deadline.  The governing principles for the interpretation of

limitations periods were set out by the  Supreme Court in Brock v Pierce County, 476

U.S. 253 (1986) where the Court explained  that its precedents provide support for the

view that government agencies do not lose jurisdiction for failure to comply with

statutory time limits unless the statute "both expressly requires an agency or public

official to act within a particular time period and specifies a consequence for failure to

comply with the provision."  476 U.S. at 259 (emphases in original; citations omitted).

Here, neither the statute nor the regulations set out any consequences for a failure to meet the applicable time limitation period.[11]

In <u>Barnhart v. Peabody Coal Co.</u>, 537 U.S. 149, 158 (2003), the Supreme Court emphasized that, since its decision in <u>Pierce County</u>, it has never construed a provision stating that the Government "shall" act within a specified time, without more, as a jurisdictional limit precluding subsequent action.[12]  Thus, as the ALJ concluded, the language of the statute providing for a 30-day investigation period was directory rather than mandatory and did not preclude the exercise of jurisdiction in the matter (AR at 288-96).

---

[11] In <u>Pierce County</u>, the Court distinguished <u>Mohasco Corp. v. Silver</u>, 447 U.S. 807, 815-18 (1980), which has also often been cited in discussions of the use of the word "shall." <u>Mohasco</u> involved the deadline for a pro se complainant to file a complaint under Title VII of the Civil Rights Act.  <u>Pierce County</u> specifically distinguished <u>Mohasco</u> on the ground that all that was involved in <u>Mohasco</u> was the filing of a complaint, whereas in <u>Pierce County</u> the agency was required "to resolve the entire dispute" within the prescribed time -- "This is a more substantial task than filing a complaint, and the Secretary's ability to complete it within 120 days is subject to factors beyond his control." 476 U.S. at 261.  <u>Mohasco</u> was also distinguished because it involved a private right of action, and "the plaintiff's failure to file a complaint prejudiced only that plaintiff."  *Id.* In <u>Pierce County</u>, by contrast, the Court determined that public rights were at stake, and the Secretary's delay, under the theory propounded by the respondent, would prejudice the rights of the taxpaying public.  *Id.*  In this connection, the Court stated that it "has frequently articulated the great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided."  *Id.* at 260 (internal quotation marks omitted).  Additionally, <u>Pierce County</u> expressly disapproved <u>Lehigh Valley Manpower Program v. Donovan</u>, 718 F.2d 99 (3d Cir. 1983), which had been relied on by Cyberworld/Tekstrom before the Board.  *See* 476 U.S. at 258 and n.5.

[12] Although <u>Barnhart</u> does not involve H-1B or other employment statutes, this general principle has been applied in various contexts.  *See, e.g.,* <u>United States v. James Daniel Good Real Prop.</u>, 510 U.S. 43, 63-64 (1993) (civil forfeiture); <u>United States v. Montalvo-Murillo</u>, 495 U.S. 711, 717-21 (1990) (Bail Reform Act); <u>Shenango Inc. v. Apfel</u>, 307 F.3d 174, 193 (3d Cir. 2002) (Coal Act), *cert. denied,* 539 U.S. 958 (2003); <u>Southwestern Pa. Growth Alliance v. Browner</u>, 121 F.3d 106, 113-15 (3d Cir. 1997) (Clean Air Act).

The ALJ recognized that the Board was protecting public rather than private rights (AR at 292 (citing United States Dep't of Labor v. Beverly Enters., Inc., ARB Case No. 99-050 (July 31, 2002) (Ex. B)). *See* Shenango, 307 F.3d at 193 (as the Court determined in Pierce County, it was "most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake.") (internal quotation marks omitted). In Shenango, the Third Circuit also found dispositive the Supreme Court's ruling in James Daniel Good, 510 U.S. at 63, that "if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." 307 F.3d at 193-94 (emphasis omitted). The Court also emphasized that "a statute stating that an agency 'shall' complete action by a certain time does not divest the agency of jurisdiction to act unless there is some additional indication in the statute of a congressional intent to bar further agency action." *Id.* at 194 (citing Southwestern Pa., 121 F.3d at 113-15).[13] As the Board has explained, the imposition of CMPs reflects the public interest associated with enforcement actions because CMPs "do not inure to the benefit of any specific individual but act as a deterrent to prevent future violations." Beverly Enters., slip op. at 20 (Ex. B). Thus, the ALJ properly rejected Cyberworld/Tekstrom's argument that "shall" sets a mandatory time-frame for completion of the investigation and issuance of a determination, which, if not adhered to, deprives the Department of Labor of its ability to pursue the action.

---

[13] Although Cyberworld/Tekstrom had mistakenly claimed that Pierce County was limited to its facts, (AR at 690-91), the Court clearly indicated that it was addressing "government agencies" generally, and that "public rights" were at stake. 476 U.S. 259-61 and n.7.

Moreover, the ALJ, as confirmed by the Board, rejected Cyberworld/Tekstrom's argument that it was "severely prejudiced" by the delay between the onset of the investigation and issuance of the determination letter (AR at 291 n.3). The ALJ emphasized that Cyberworld/Tekstrom had admitted its violation at the beginning of the investigation, and thus, "the persuasive force" of any argument that prejudice resulted from a delay was "significantly diminished" (*Id.*). In regard to the public interest rationale, the Supreme Court has stated that "[a]s a general rule, laches or neglect of duty on the part of officers of the government is no defense to a suit by it to enforce a public right or protect a public interest." Utah Power & Light Co. v. United States, 243 U.S. 389, 409 (1917). *Cf.* OPM v. Richmond, 496 U.S. 414, 422 (1990) (the Supreme Court has "reversed every finding of estoppel [against the government] that [it has] reviewed").[14] Although Cyberworld/Tekstrom had asserted prejudice because employees had left the company or would not be able to testify effectively due to the passage of time, the ALJ recognized that Cyberworld/Tekstrom failed to actually show any prejudice because it acknowledged its violation early on, and did not even challenge the amount of the CMPs assessed. This was followed by the parties' joint stipulation of facts and cross-motions for summary judgment, thereby obviating any factual disputes. Accordingly, the ALJ's conclusion that any delay could not reasonably have prejudiced Cyberworld/Tekstrom's presentation of the remaining issues, which were purely legal, was correct.

---

[14] The ALJ also noted that a laches defense is generally not applicable against a federal government agency when it is "enforcing public interests," as was surely the case here (AR at 291 n.3) (citation omitted).

IV.    **THE ALJ PROPERLY DETERMINED THAT DEBARMENT UNDER THE H-1B STATUTE AND REGULATIONS WAS MANDATORY BECAUSE OF CYBERWORLD/TEKSTROM'S FAILURE TO MAKE THE DISPLACEMENT INQUIRY OF ITS SECONDARY EMPLOYERS.**

Cyberworld/Tekstrom admitted that its failure to make the necessary inquiry was a violation per se, and did not explicitly dispute the assessment of the $3,400 CMP (AR at 634). Rather, Cyberworld/Tekstrom argued against the Administrator's ability to bring the action in the first instance, and whether it should have been debarred. However, the sanction of debarment is inextricably intertwined with the "failure to inquire" violations. Cyberworld/Tekstrom cannot evade the results of its conduct.

An H-1B-dependent employer is prohibited from placing non-exempt H-1B nonimmigrant employees with another employer, where there are indicia of an employment relationship between the nonimmigrant and the other employer, unless the H-1B employer has made the required inquiry as to whether the other employer has displaced, or intends to displace, similarly employed United States workers within 90 days before and after such placement. *See* 8 U.S.C. 1182(n)(1)(F); 20 C.F.R. 655.738(d)(5). Cyberworld/Tekstrom, which has not denied its status as an H-1B-dependent employer, violated this requirement when it placed its 14 H-1B employees with other employers and failed to make the mandatory inquiry. All but one of these employees was to be placed with a different employer by Cyberworld/Tekstrom's vendors. Cyberworld/Tekstrom's status as an H-1B-dependent employer triggered its obligation to make the inquiry of the vendors and to ensure that assurances were obtained that there would be no displacement of United States workers when its H-1B employees

were placed with other employers.[15]  *See* 20 C.F.R. 655.738(d); *see also* 20 C.F.R.

655.736(g).

        A.      <u>Under the Applicable Provisions and Its Own LCA Attestations,</u>
<u>Cyberworld/Tekstrom Was Required to Make the Displacement Inquiries</u>
<u>Regardless of Where the Workers Were Placed.</u>

      Consistent with the statute's purpose, Congress has placed squarely upon H-1B-

dependent employers the responsibility to make the inquiry of secondary or other

employers regarding displacement of United States workers during the relevant period.

As the regulations provide, this may include making an inquiry of a "tertiary" or

"downstream" employer.  *See* 20 C.F.R. 655.738(d)(3).  The regulation states that the

secondary or other employer

> would often be (but is not limited to) the client or customer of an H-1B
> employer that is a staffing firm or a service provider which offers the
> services of H-1B nonimmigrants under a contract . . . .  Only the H-1B
> employer placing the nonimmigrant with the secondary employer is
> subject to the non-displacement obligation on the LCA, and only that
> employer is liable in an enforcement action pursuant to subpart I of this
> part if the other/secondary employer, in fact, displaces any of its U.S.
> worker(s) during the applicable time period.

*Id.*

      Therefore, Cyberworld/Tekstrom is not exempt from compliance with the non-

displacement inquiry provisions because its vendors are intermediary businesses.  The

use of the words "not limited to," and the use of "other" in addition to "secondary

employer" in the regulations, clearly show that there was no intention to limit the

---

[15] Cyberworld/Tekstrom's excuse for not making the inquiry regarding the one employee
who was placed with its own client was that it did not know that the employee had been
placed until well after the 90 days had passed (AR at 709).  Cyberworld/Tekstrom did not
explain how this could have happened or why that should excuse its failure to meet its
statutory obligation.

displacement inquiry requirements to an H-1B employer's immediate clients.  *See generally* 20 C.F.R. 655.738(d).[16]  Accordingly, where there are "secondary" and "other" employers with whom H-1B nonimmigrants are placed and which have the indicia of employment, the responsibility to make the inquiry applies, irrespective of how far down the line the placement occurs.[17]

The H-1B-dependent employer has some flexibility as to how it chooses to satisfy its non-displacement obligations.  It is required to exercise "due diligence" and to engage in reasonable efforts to inquire about potential secondary displacement, through methods which may include, but are not limited to, securing and retaining written assurances from the secondary or other employer; maintaining memoranda in its files regarding oral commitments made by those employers; or including a secondary displacement clause in a contract with the secondary or other employer.  *See* 20 C.F.R. 655.738(d)(5)(i).  In discussing the employer's obligations, however, the *Federal Register* Preamble to the regulations states: "While a dependent employer has discretion as to how it will meet this obligation, it <u>must</u> make the inquiry <u>in every case</u> where there will be indicia of an employment relationship."  65 Fed. Reg. at 80151 (emphases added).  As Senator

---

[16] It is significant that "[e]mployers are cautioned that even if the required inquiry of the secondary employer is made, the H-1B-dependent or willful violator employer shall be subject to a finding of a violation of the secondary displacement prohibition if the secondary employer, in fact, displaces any U.S. worker(s) during the applicable time period (see § 655.810(d))."  20 C.F.R. 655.738(d).

[17] The logical extension of the argument made by Cyberworld/Tekstrom before the Board is that H-1B- dependent employers would simply contract with intermediaries such as the vendors here, where there are few, if any, indicia of an employment relationship.  Intermediaries would then place the nonimmigrant workers with clients with which the H-1B workers do have the indicia of an employment relationship, and there would be no need for an inquiry as to the displacement of United States workers to be made at any level. United States workers could then be displaced by these "other" employers with impunity.

Abraham, the sponsor of the Senate bill, stated: "In particular, the covered employer must promise to inquire whether the other employer will be using the H-1B worker to displace a U.S. worker whom the other employer had laid off or intends to lay off within 90 days of the placement of the H-1B worker.  The covered employer must also state that it has no knowledge that the other employer has done so or intends to do so."  144 Cong. Rec. S12751 (Oct. 21, 1998); 65 Fed. Reg. at 80150.  Indeed, on Cyberworld/Tekstrom's 14 LCAs, it had attested that it would make the required displacement inquiries of secondary or other employers.

Cyberworld/Tekstrom claimed it could not have made the inquiry of the businesses in which its H-1B employees were placed because they were placed there by the vendors without Cyberworld/Tekstrom's <u>knowledge</u> of where they were assigned.  As the ALJ concluded, however, the statutory requirement to inquire, at 8 U.S.C. 1182(n)(1)(F), "has no knowledge element.  Simple failure to comply with the applicable LCA condition is a violation that leads to a one year disqualification sanction. Consequently, for this offense, [Cyberworld/Tekstrom's] lack of knowledge of the tertiary employers is not a defense."  (AR at 641) (footnote omitted).

Moreover, Cyberworld/Tekstrom has identified the employers with which it placed its H-1B workers as vendors (AR at 663).  Therefore, it knew that the H-1B employees were to be further placed (and very likely within a short time) with other employers.  It was incumbent on Cyberworld/Tekstrom to make a direct inquiry, or to seek assurances, that there would be no displacement of United States workers. *Cf.* Preamble, 65 Fed. Reg. at 80187-88 (regardless of whether an employer is taking

24

advantage of short-term placement options, it is obliged to be vigilant in maintaining its compliance by being aware of the locations of its H-1B workers).

Of course there were several ways in which Cyberworld/Tekstrom could have obtained the required assurances. It could have learned from the intermediary vendors where the H-1B employees would be placed and sought assurances directly from those other employers; it might also have sought verbal or contractual assurances from the vendors that the vendors would ensure that the employers with which they placed the H-1B workers had not displaced, and did not intend to displace, any United States workers. Cyberworld/Tekstrom might also have inserted a non-displacement clause in each of its contracts with the intermediary vendors which would call for the inquiry to be made by the vendor of its clients. *See* 20 C.F.R. 655.738(d)(5)(i); Preamble, 65 Fed. Reg. at 80150-51. Cyberworld/Tekstrom did none of these. Accordingly, Cyberworld/Tekstrom cannot avoid the consequences of its failure to make the requisite inquiries regarding the displacement of United States workers.

    B.    <u>Referral to the AG for Purposes of Debarment Was Mandatory Under the Applicable Provisions.</u>

The H-1B statute states unequivocally that an H-1B-dependent employer's failure to make a displacement inquiry of a secondary or other employer before placement of an H-1B worker <u>requires</u> at least a one-year debarment. *See* 8 U.S.C. 1182(n)(2)C)(i)(I) , (II); *see also* <u>Kolbusz-Kijne v. Technical Career Inst.</u>, 1993-LCA-4 (Sec'y July 18, 1994), slip op. at 8 and n.7 (Ex. A) (Secretary reduced CMPs for H-1B violation but, citing 8 U.S.C. 1182(n)(2)(C), mandated debarment). Under section 1182(n)(2)(C)(i)(I) and (II), whenever the Secretary finds a failure to inquire of secondary or other employers as to the displacement of United States workers, she <u>must</u> notify the AG, who then <u>cannot</u>

approve petitions from the employer for at least a one-year period.  The statute thus uses the term "shall" both in mandating that the Secretary notify the AG for purposes of debarment and in ordering that the AG institute a debarment sanction of at least one year. *Compare* 8 U.S.C. 1182(n)(2)(C)(i)(I) (stating that the Secretary "<u>may</u>, in addition impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per violation) as the Secretary determines to be appropriate") (emphasis added).

Nothing in the legislative history suggests that Congress intended the term "shall" to have anything other than a mandatory meaning in this context.[18]  Likewise, nothing in the regulations or Preamble suggests that either the Secretary or the AG has any discretion to modify or waive the requirement of debarment where an H-1B-dependent employer has failed to make the required secondary displacement inquiry.[19]

In arguing that the Board could exercise discretion because its violation was inadvertent rather than willful and no one was harmed as a result, Cyberworld/Tekstrom ignored the purpose of this law and the statute's penalty scheme.  The primary purpose of ACWIA and its regulations is the protection of United States workers from displacement by nonimmigrants.  As stated in the Preamble, "the purpose of the statute [is] to assist U.S. workers in retaining their employment where their jobs may be threatened by the

---

[18] Those portions of the legislative history on which Cyberworld/Tekstrom relied before the Board to claim that debarment is discretionary, *see* AR at 613-14, are from a period prior to the enactment of ACWIA, and did not involve the protections for United States workers that were added by ACWIA, which include the requisite displacement inquiry by H-1B-dependent employers.  Thus, citation to earlier legislative history is inapposite.

[19] *Compare* 29 C.F.R. 655.810(c), which lists mitigating factors that the Administrator will consider in determining the amount of CMPs to be assessed.

actual or potential placement of H-1B workers."  65 Fed. Reg. at 80144.  The Preamble further quotes Senator Abraham, who noted the particular problem of "job shops," of which Cyberworld/Tekstrom is an example.  Senator Abraham stated that the bill was "very mindful of the concerns people have that somehow these H-1B temporary workers might end up filling a position where an American worker could have filled the slot.  Our goal is to make sure that does not happen."  *Id.* (quoting 144 Cong. Rec. at S10878 (Sept. 24, 1998)).

In this vein, the ALJ aptly stated that "[a]n employer who fails to comply with the strike/lock out LCA condition and an H-1B-dependent employer who doesn't comply with the additional LCA conditions concerning direct displacement and secondary displacement inquiries [all of which are directly related to the loss of work by United States workers], are subject to the sanction provisions, even if the failures to comply were neither substantial nor willful" (AR at 644).  And, "[i]nterpreting the term ['shall'] otherwise [than mandatory] would diminish Congress' apparent conclusion that LCA conditions directly impacting the employment of U.S. workers, including the secondary displacement inquiry requirement under Section 1182(n)(1)(F), are the most important conditions and warranted the highest degree of protection through sanctions" (*Id.*).

Cyberworld/Tekstrom contended that the use of "shall" with regard to debarment and in connection with time limits should be given the same interpretation.  This argument is without merit.  It is axiomatic that the presumption that identical words used in different parts of an act are intended to have the same meaning "readily yields" when dissimilar contexts show that the intent or purpose of the two parts is different.  *See, e.g.*, Libbey Glass, Div. of Owens-Ill., Inc. v. United States, 921 F.2d 1263, 1265 (Fed. Cir.

1990) (quoting Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433 (1932)).[20]   And, that the two provisions in question serve different purposes is manifest.[21]

Cyberworld/Tekstrom also wrongly relied on Heckler v. Chaney, 470 U.S. 821, 831 (1985), and its progeny (see AR at 700-02).  Heckler v. Chaney dealt with the question of whether a court may review an action "committed to agency discretion," 5 U.S.C. 701(a)(2), i.e., entrusted to the agency in the first instance, where a decision not to enforce has been made -- "This recognition of the existence of discretion is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement."  470 U.S. at 831.  That is clearly not the case here, where enforcement action, pursuant to a statutory command, has been taken.

Cyberworld/Tekstrom also argued that, because the determination letter failed to cite the proper section of the regulations dealing with debarment for a failure to inquire regarding the displacement of United States workers, 20 C.F.R. 655.810(d)(1), it could not be debarred (AR at 703-05).  Section 655.815(c), however, states that the written determination required by section 655.805 shall "[s]et forth the determination of the Administrator and the reason or reasons therefor, and in the case of a finding of violation(s) by an employer, prescribe any remedies, including the amount of any back wages assessed, the amount of any civil money penalties assessed and the reason

---

[20] None of the cases that were cited by Cyberworld/Tekstrom before the Board was to the contrary, and they were, therefore, unpersuasive (see AR at 697-98).

[21] Time limits, like all statutes of limitations, deal with procedural aspects of a case and are designed to serve such purposes as the pace of resolution of issues.  On the other hand, the provisions regarding the displacement inquiry impact the most substantive and basic matters involved in H-1B actions -- protection of United States workers.

therefor, and/or any other remedies assessed."  20 C.F.R. 655.815(c).  That is precisely

what the determination letter did in this case.  It specified the violation ("failed to make

the required displacement inquiry of the secondary employer"); it specified the CMP ("As

a result of the violation, a civil money penalty in the total amount of $3,400 is assessed");

and it stated that "the Attorney General (AG) shall be notified of the occurrence of this

violation when this determination becomes final [whereupon at least a one-year

debarment shall be imposed]" (AR at 1-4).  Cyberworld/Tekstrom was therefore on

notice of the violations it was alleged to have committed, as well as the remedies and

sanction sought.  Indeed, Cyberworld/Tekstrom acknowledged as much when it requested

a hearing just "for the simple reason that one-year debarment imposed on

[Cyberworld/Tekstrom] is out of proportion" (AR at 36).

        Moreover, Cyberworld/Tekstrom's argument that the determination letter's

reference to 20 C.F.R. 655.855(a) was fatal, because the subsection speaks of violations

that require notification to the AG as being identified in section 655.810(f), which in fact

mentions no violations, also has no merit.  First, as the ALJ stated, the statute, which is

cited in the determination letter, 8 U.S.C. 1182(n), clearly calls for debarment for the

violation at issue (AR at 635-36).  *See* 8 U.S.C. 1182(n)(2)(C)(i)(I).  Second, as the ALJ

further stated, the incorrect reference in the regulation is clearly an "administrative error"

(AR at 635).  Although the applicable regulation, 20 C.F.R. 655.810(d), which was not

cited in the determination letter, calls for at least one-year debarment for the violation at

issue -- failure to inquire about the displacement of United States workers -- it also states

that notification of the AG is to be made pursuant to 20 C.F.R. 655.855, which was cited

in the determination letter.[22]  Again, looked at in context, the determination letter

certainly provided Cyberworld/Tekstrom the necessary notice of the violations and

consequent remedies and sanction sought.

---

[22] The regulation at 20 C.F.R. 655.810(d)(1) cross references section 655.810(b)(1)(i),
which posits "displacement of U.S. workers," but not specifically the failure to inquire
about such displacement.  But, as the ALJ stated, "although the sole use of 'displacement
of U.S. workers' in 20 C.F.R. 655.810(b)(1)(i) might suggest the sanction is applicable
only in situations involving the actual displacement of a U.S. worker, the statutory
language definitively applies the sanction to both actual displacement and failure to make
the secondary displacement inquiry.  Consequently, the clear language of the statute
controls over any perceived regulatory uncertainty" (AR at 637).  In any event, the
regulation at 20 C.F.R. 655.738, which is cited alongside the term "displacement of U.S.
workers" at 20 C.F.R. 655.810(b)(1)(i), specifically includes the obligation to make
displacement inquiries of secondary/other employers.  *See* 20 C.F.R. 655.738(d)(5).
Thus, "by referencing Section 655.738 in connection with displacement of U.S. workers,
section 655.810(b)(1)(i) reasonably draws in both direct displacement and secondary
displacement obligations, making failure to make a secondary inquiry a section
655.810(b)(1)(i) violation, which then triggers the section 655.810(d)(1) one year
disqualification" (AR at 637).

## **CONCLUSION**

For the reasons stated, this Court should grant the defendants' motion for

summary judgment.

 Dated: January 11, 2007

                                    Respectfully submitted,

                                    COLM F. CONNOLY
                                    United States Attorney

                                    _____/s/ Seth M. Beausang_____
                                    Seth M. Beausang (DE I.D. No. 4071)
                                    Assistant United States Attorney
                                    1007 N. Orange Street, Suite 700
                                    P.O. Box 2046
                                    Wilmington, Delaware 19899-2046
                                    (302) 573-6277, ext. 149
                                    (302) 573-6220 (fax)

OF COUNSEL:

HOWARD M. RADZELY
Solicitor of Labor
United States Department of Labor

STEVEN J. MANDEL
Associate Solicitor
Fair Labor Standards Division

WILLIAM C. LESSER
Deputy Associate Solicitor

JONATHAN M. KRONHEIM
Counsel for Trial Litigation

JOAN BRENNER
Attorney
Office of the Solicitor

**CERTIFICATE OF SERVICE**

I, Seth M. Beausang, hereby attest under penalty of perjury that on this 11th day of January 11, 2007, I caused a copy of the Brief in Support of Defendants' Motion for Summary Judgment and all exhibits to be served on the following counsel for Plaintiff by electronic filing:

Stephen J. Neuberger
The Neuberger Firm, P.A.
2 East 7th Street
Suite 302
Wilmington, DE 19801
(302) 655-0582
Email: SJN@NeubergerLaw.com

_____ /s/ Seth M. Beausang
Seth M. Beausang (De. I.D. No. 4071)

EXHIBIT A

U.S. DEPARTMENT OF LABOR

SECRETARY OF LABOR
WASHINGTON, D.C.

DATE:        July 18, 1994
CASE NO.     93-LCA-0004


IN THE MATTER OF

EVA KOLBUSZ-KIJNE,

      COMPLAINANT,

  v.

TECHNICAL CAREER INSTITUTE,

      RESPONDENT.


BEFORE:    THE SECRETARY OF LABOR


FINAL DECISION AND ORDER

Before me for review is the Administrative Law Judge's (ALJ) Decision and Order (D. and O.) issued on October 14, 1993, in this case arising under Section 1101(a) (15) (H) (i) (b) and Section 1182(n) of the Immigration and Nationality Act of 1952, as amended (INA), 8 U.S.C. § 1101 et seq. (1991), and the implementing regulations at 29 C.F.R. Part 507, Subparts H and I (1993).[1]  In his D. and O., the ALJ assessed a civil money penalty of $1,000 against Respondent and remanded the complaint to the Administrator of the Wage and Hour Division, Employment Standards Administration (Administrator) for further consideration of whether the Department of Labor (DOL) has any authority to direct a remedy for Complainant in this case.

Pursuant to the provisions of 29 C.F.R. § 507.845(c) (1993), I accepted review of the ALJ's D. and O. to consider the following issues: whether the ALJ, based on the record evidence, erred in determining that the employer committed violations requiring that it be barred from participating in the "H-1B" visa program pursuant to 8 U.S.C. §§ 1101(a) (15) (H) (i) (b), 1182(n), 1184(g) (1) (A), and 1184(i); and whether the relief fashioned by the ALJ was appropriate under the circumstances presented. See Notice of Intent to Review issued Feb. 2, 1994.

---

[1]The Secretary's regulations are also found at 20 C.F.R. Part 655, Subparts H and I (1993).

Complainant, Respondent, the Administrator, and United Auto Workers, AFL-CIO, Local #2110 (Union) have filed briefs before me on the issues presented for review.[2] Based on a careful review of the record, the ALJ's D. and O. and the parties' briefs, I conclude that Respondent violated the statutory and regulatory requirements governing the filing of labor condition applications for H-1B visas and that such violations must be reported to the Attorney General and the Employment and Training Administration (ETA). Moreover, I find that the applicable provisions of the INA provide no relief to Complainant with respect to her additional allegations that TCI's hiring under the H-1B visa program resulted in her layoff and have adversely affected other U.S. workers at TCI. These conclusions are discussed more fully herein, following a brief review of the instant facts and the governing statutory and regulatory provisions. Because this is a case of first impression before me, the following discussion is intended to clarify the procedural and substantive requirements of the H-1B visa application process and its enforcement.

Procedural History And Facts

Respondent, Technical Career Institute (TCI), is an educational institution which hires teachers of English as a second language (ESU). Complainant was employed by TCI as an ESU teacher for temporary periods from September 1991 until February 1993, when Complainant was informed that she must be laid off because of a decline in enrollment. See Letter from Edward Leff, Vice-President TCI, dated Feb. 16, 1993. The Union represented the bargaining unit to which Complainant and the H-1B workers belonged. Complainant's layoff was governed by the seniority provisions of the collective bargaining agreement between Respondent and the Union.

Complainant filed a complaint with the Wage and Hour Division of the Employment Standards Administration (ESA) of the U.S. DOL dated April 29, 1993, requesting that DOL investigate the certification for H-1B visas for nonimmigrant instructors of ESU at TCI, on the grounds that working conditions of U.S. workers had been adversely affected by the employment of H-1B nonimmigrants. Complainant further stated that,

> "An additional reason for this request lies in the fact that, according to the union shop stewards, to the best of their knowledge the trade union bargaining representative has not been informed about the employment of nonimmigrants when TCI hired them, nor that these positions have otherwise been made available for U.S. workers."

Complainant's letter of April 29, 1993 (attached to Complainant's June 23, 1993 letter to ALJ).

Upon receipt of the complaint letter, the Administrator conducted an investigation and the District Director of Wage and Hour, ESA, issued the Administrator's Determination on June 23, 1993, concluding that TCI was operating in compliance with the H-1B provisions of the INA and attaching copies of the labor condition applications (Form ETA 9035) investigated. The labor condition applications in question were signed and dated by Respondent on January 9, 1992, January

[2] The documentary evidence filed before me (submitted as attachments to the parties' respective briefs), which was not presented at the ALJ hearing, is not evidence in the formal record in this case. Additional arguments raised in the parties' briefs before me, however, will be addressed.

12, 1993 and February 19, 1993, and all have marked box (d) (1) indicating that as of that date, notice of the application had been provided to workers employed in the occupations in which H-1B workers would be employed, through notice to the bargaining representatives of these workers. The Union first received documents from TCI concerning applications for H-1B visas in March 1993. CX-1, attachment 4, letter dated July 29, 1993 to Mrs. Kolbusz-Kijne from Union's Recording Secretary; Tr. at 27-28, 97. Respondent met with the Union in November 1991 to discuss anticipated layoffs of ESL teachers, including H-1B nonimmigrants. Tr. at 20.[3]

Complainant timely requested an ALJ hearing which was held on August 10, 1993. The ALJ issued his decision on October 14, 1993, and Complainant, Respondent and the Administrator petitioned for review of the ALJ's D. and O. On December 3, 1993, the Administrator advised the Attorney General of the ALJ's findings, and on January 26, 1994, INS advised that petitions for H-1B visas filed by Respondent would not be approved for a one year period from January 26, 1994 to January 25, 1995.

<u>ALJ's Decision</u>

After the August 10 hearing on this matter, the ALJ found that Respondent failed to comply with the provisions of the INA and the implementing regulations governing the filing of labor condition applications for H-1B nonimmigrant visas. The ALJ concluded that the 3 challenged labor condition applications in evidence each contained a misrepresentation by Respondent, i.e., attestation that the appropriate bargaining representative had been notified of Respondent's filing of the labor condition applications for H-1B nonimmigrants under INA Section 1182(n). Accordingly, the ALJ addressed the issue of civil money penalties pursuant to 29 C.F.R. § 507.810. He excused one of the violations of 29 C.F.R. § 507.805(a) (1), finding that the first labor condition application was filed prior to the effective date of the regulations. He then assessed a civil money penalty of $500 for each of the other two violations. Additionally, the ALJ stated that neither the INA nor the applicable regulations provide a remedy for Complainant's assertion that she was laid off as a result of Respondent's hiring aliens under these flawed labor condition applications, and he remanded the complaint to the Administrator for further consideration of this issue, and also recommended that the statute should be amended in this respect. Finally, the ALJ informed the parties that pursuant to 29 C.F.R. § 507.855, the Administrator would notify the Attorney General and ETA of the finding that Respondent violated the applicable statutory and regulatory provisions.

---

[3]     The Union's Brief in Opposition to the ALJ's Decision, dated March 14, 1994, asserts that the Union had "substantial <u>de facto</u> notice of the elements which would have been included in such notices. . . the salaries being paid to the H-1B workers and their working conditions. . . ." In support of this contention the Union has submitted, attached to their brief, a copy of a January 11, 1994 letter from the Union's Recording Secretary to Dr. Leff of TCI. Although the letter tends to support the Union's position, it is not a part of the formal record in this case. In any event, it would not alter my finding on the issue of whether Respondent provided the required notice to the appropriate bargaining representative.

<u>Statute and Regulations</u>

The INA of 1952 was amended in pertinent part on November 29, 1990 (Immigration Act of 1990, Pub. Law 101—649, 104 Stat. 4978), and again on December 12, 1991 (Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. Law 102-232, 105 Stat. 1733). As amended, the statute defines classes off aliens who are not considered "immigrants" under the U.S. immigration law and who may enter the U.S. for prescribed periods of time and for prescribed purposes under various types or classes of visas. 8 U.S.C. § 1101(a)(15).

One such class of noniimmigrant aliens known as "H-1B" are allowed entry into the U.S. on a temporary basis to work in "specialty occupations," or as fashion models of distinguished merit and ability. 8 U.S.C. § 1101(a)(15)(H)(i)(b). Specialty occupations for purposes of obtaining an H-1B visa are defined at 8 U.S.C. 1184(i). This is a limited visa program. The total number of aliens who may be issued H-1B nonimmigrant visas during any fiscal year may not exceed 65,000 and the period of authorized admission as such a nonimmigrant may not exceed 6 years. <u>See</u> Section 1184(g). The Attorney General (INS) has the authority to determine whether an alien satisfies the criteria for entry to the U.S. as a nonimmigrant under § 1101(a)(15)(H). <u>See</u> Section 1184(a) and (c).

Since the effective date of the 1990 Amendments, intending employers are required to file an application (labor condition application) with the Secretary of Labor under Section 1182(n) (1) as part of the process of obtaining an H-1B nonimmigrant visa, for each alien it is petitioning to employ in a specialty occupation. The statute also provides that,

> "Unless the Secretary [of Labor] finds that the application is incomplete or obviously inaccurate, the Secretary shall provide the certification described in section 1101(a)(15)(H)(i)(b) of this title within 7 days of the date of the filing of the application."

8 U.S.C. § 1182(n)(1). The INA sets out detailed obligations concerning wages and working conditions to be met by intending employers with regard to the H-1B nonimmigrant who is to enter the U.S. to perform services for that employer in a specialty occupation. <u>See</u> 8 U.S.C. § 1182(n) (1) (A).

The Secretary's implementing regulations, found at 29 C.F.R. Part 507, Subparts H and I, set forth the responsibilities of the DOL in administering the labor condition application (LCA) process and enforcement provisions, and delineate the requirements for employers seeking to employ aliens on H-1B visas. 29 C.F.R. §§ 507.700, 507.705, 507.800. Specific guidelines are provided for employers on filing labor condition applications with ETA, the agency responsible for receiving and making determinations on labor condition applications. 29 C.F.R. § 507.700(a)(3), (a)(4), and (b)(1); § 507.730. The Administrator performs the Secretary's duty to investigate and resolve any complaints filed with DOL concerning the labor condition application or the employment of the H-1B nonimmigrant as required at Section 1182(n)(2)(A). 29 C.F.R. § 507.705(a)(2); § 507.800 <u>et seq</u>.

An employer who intends to employ an H-1B alien must submit a completed, dated and signed labor condition application (Form ETA 9035) which contains all required information, including specific labor conditions statements: 1) attestation that it will pay the H-1B aliens the

required wage rates 2) attestation that it maintain the prevailing working conditions, i.e. hours, vacation, fringe benefits (employment of H-1B nonimmigrants will not adversely affect the working conditions of workers similarly employed); 3) attestation that there is no strike or lockout for the occupational classification at intended place of employment of H-1B alien; 4) attestation that it provided notice of the filing of a labor condition application to the bargaining representative of the employees in the occupational classification in which the H-1B nonimmigrants will be employed, or if no bargaining representative, posted notice of filing in conspicuous locations in the area of intended employment.  8 U.S.C. § 1182(n) (1); 29 C.F.R. § 507.730.

The required notice must contain specific details of the application including the number and classifications of nonimmigrant workers, the wages offered arid the period and location of employment, 29 C.F.R. § 507.730(h), and further, notice must have been provided at the time of filing the labor condition application, 29 C.F.R. § 507.730(d)(4).

Merits

The first issue raised before me is whether Complainant had standing to file the instant complaint challenging three labor condition applications filed by Respondent with the intent to obtain, or extend, H-1B nonimmigrant visas for intended employees. Complainant challenged the labor condition applications on the grounds that Respondent misrepresented that it had complied with the notice requirement of the INA. I reject the Union's argument that Complainant had no standing to file this complaint.

Section 1182(n) (2) (A) states that,

The Secretary shall establish a process for the receipt, investigation, and disposition of complaints respecting a petitioner's failure to meet a condition specified in an application submitted under paragraph (1) or a petitioner's misrepresentation of material facts in such an application. Complaints may be filed by any aggrieved person or organization (including bargaining representatives). No investigation or hearing shall be conducted on a complaint concerning such a failure or misrepresentation unless the complaint was filed not later than 12 months after the date of the failure or misrepresentation, respectively.  The Secretary shall conduct an investigation under this paragraph if there is reasonable cause to believe that such a failure or misrepresen

Here, Complainant was an employee of the employer in the occupational classification and area for which aliens were sought, and the requisite notice was to her bargaining representative. Although investigation may reveal that Complainant suffered no tangible harm from the failure to notify, the regulations make clear that the notice requirement is intended to provide information to the employees in the area where the H-1B nonimmigrants are intended to work. 29 C.F.R. § 507.730(h). Moreover, the regulations require that this notice include a specific statement on the filing off complaints alleging misrepresentation of material facts in the labor condition application and/or failure to comply with the terms of the labor condition application. See 29 C.F.R. § 507.730(h)(1)(i).

The filing of complaints in this scheme is not solely to provide a remedy to the individual aggrieved persons, but to initiate investigations and enforcement by the Administrator where found appropriate to ensure compliance with the law. A broad reading of the relevant statutory language, "any aggrieved person or organization (including bargaining representative)," promotes effective enforcement of the H-1B labor condition application process and helps to achieve the Congressional intent of protecting both U.S. and foreign workers in the H-1B program. See 57 Fed. Reg. 1317, 1323 (January 13, 1992) (Interim Final Rule).

The statute provides that the DOL should review labor condition applications only for "completeness and obvious inaccuracies" and should provide certification within 7 days of the date of filing. 8 U.S.C. § 1182(n)(1). The DOL has promulgated regulations which provide for a simple, expeditious review of labor condition applications, but also implement a complaint driven enforcement system for the protection of workers. This is in compliance with the statutory requirement of establishing a system to conduct investigations to determine whether an employer failed to meet a condition specified in the labor condition application or misrepresented a material fact on its application. 8 U.S.C. § 1182(n)(2). The plain language of the statute and the legislative history of the 1991 amendments to the H-1B provisions, reveal that Congress intended to achieve both of these purposes: streamlined application process and effective complaint driven enforcement process for the protection of workers. See 137 Cong. Rec. S18243 (daily ed. November 26, 1991) (statement of Senator Simpson); 137 Cong. Rec. S18245 (daily ed. November 26, 1991) (statement of Senator Kennedy). Consistent with both of these purposes it is important to broadly define who may file complaints, and thereby initiate investigations. See 58 Fed. Reg. 52157 (October 6, 1993) (Preamble to Proposed Rules, on regulatory language pertaining to employee notice, and on defining "Aggrieved" and "Interested" parties).

Next, the Union correctly argues that the complaint is untimely to challenge the labor condition application filed by Respondent on January 9, 1992. Section 1182(n)(2)(A) of the INA states that complaints will not be investigated unless they are filed not later than 12 months after the date of the failure or misrepresentation. See also 29 C.F.R. §507.805(c)(5). In this case the complaint was filed on April 29, 1993, more than 12 months after the labor condition application was filed on January 9, 1992. Accordingly, this allegation of the complaint is dismissed and will not be addressed herein.[4]

I must now consider whether Respondent complied with the statutory and regulatory requirements for filing labor condition applications for H-1B visas. On review of the evidence and the arguments of the parties on this issue, I agree with the ALJ's finding that Respondent failed to notify the bargaining representative as required under the Act and regulations and, further, that Respondent's labor condition statements misrepresented this fact.

The burden is on the employer to develop documentation to prove the validity of its statements in the labor condition application. 29 C.F.R. § 507.705(c)(5). Here, TCI failed to present evidence sufficient to satisfy that burden before the ALJ. At the hearing Vice-President Edward Let f admitted a failure to notify the bargaining representative of the labor condition application filings. T.

---

[4]    Because the ALJ concluded that no penalty was warranted with respect to this allegation, any error in considering this violation was harmless.

at 27. Moreover, in a letter dated July 20, 1993, from Edward Leff to the ALJ, he stated that "TCI unknowingly did not notify the collective bargaining unit of applications of H-1B visas...." At the hearing, Respondent's counsel asserted that Mr. Leff was verbally amending that statement and asserting that there was no violation, Tr. at 59-60, even though Mr. Leff earlier in the same hearing reiterated his failure to notify.

Additionally, the Union's letter of July 29, 1993, drafted by Susan Lyons, Recording Secretary, in response to Complainant's inquiry states that, "This letter responds to your question about when TCI notified the union of instructors with H1-B visas. To the best of my recollection, we received documents from the College concerning applications for H1-B visas in March of 1993... This was the first time we received such documents." Union representatives testifying at the hearing consistently indicated no knowledge of labor condition application filings or of hiring of nonimmigrants. Accordingly, despite the Union's assertions before me now, that Respondent provided sufficient notice of its labor condition applications in meetings in 1991, and that the Union was aware of the H-1B status of employees within TCI and the terms of their employment, I find that Respondent failed to provide the requisite notice of the challenged labor condition applications, and that these labor condition applications contained a misrepresentation of a material fact. Additional evidence and arguments concerning Respondent's motivation and intent in committing these violations, and the harm which resulted from the violations, are more properly considered in determining appropriate sanctions for the established violations.

Although I agree with the ALJ's findings that Respondent's misrepresentations in the latter two labor condition applications violate the Act and regulations governing the H-1B visa program, I disagree with the ALJ's dicta concerning the purposes of the labor condition application requirements, and the statutory and regulatory framework of the H-1B nonimmigrant visa program.

Addressing Complainant's allegations that she was laid off because of the improper employment of nonimmigrants under the H-1B visa program, the ALJ made statements concerning the impropriety of employers hiring H-1B nonimmigrants to displace U.S. workers, and the failure of the Act and regulations to provide a remedy for such displaced U.S. workers. The ALJ also speculated that "Respondent stated that the violations were inadvertent, although it seems more likely to me that it knew the union would probably object if it found out about the applications." R.D. and O. at 4.

Contrary to Complainant's assumptions, however, the H-1B visa program does not require an employer to show that U.S. workers are not available for the positions which the nonimmigrants are being hired to fill.[5] The intent of the labor condition application provisions was to protect the wages and working conditions of H-1B workers, and thereby, also protect the wages and working

---

[5]        Other INA visa programs governing the hiring of foreign workers do contain such a requirement, e.g. H-lA visa for foreign nurses, and H-2B for foreign agricultural workers. Both the Union arid Respondent correctly point out that the ALJ and Complainant apparently confuse the labor condition statement requirements for H-1B visas and the labor certification requirements imposed in other INA employment based visa programs. The labor certification requirement necessitates a finding that sufficient U.S. workers are not available for the position. No such requirement was included in the H-1B program.

conditions of U.S. workers similarly employed. These provisions do not prohibit or prevent employers from hiring H-1B workers where U.S. workers are available and are not intended to remedy Complainant's layoff.[6]  Accordingly, this case need not be remanded to the Administrator for further consideration of remedies available to this individual Complainant.

Remedies

Under Section 1182(n) (2) (C) of the INA, the Secretary may impose penalties as follows:

> If the Secretary finds, after notice and opportunity for a hearing, a failure to meet a condition of paragraph (1) (B), <u>a substantial failure to meet a condition of paragraphs (1) (C)</u> or (1) (D), a wilful failure to meet a condition of paragraph (1) (A), <u>or a misrepresentation of material fact in an application</u>-- (i) the Secretary shall notify the Attorney General of such finding and may in addition, impose such other administrative remedies (including civil money penalties in an amount not to exceed $1,000 per violation) as the Secretary determines to be appropriate, and (ii) the Attorney General shall not approve petitions filed. " (emphasis added)

The implementing regulations on remedies are found at 29 C.F.R. §507.810, and state that upon determining that the employer has committed any violation(s) described in 507.805(a) of this part, the Administrator may assess a civil money penalty not to exceed $ 1,000 per violation. In the instant case, it has been determined that Respondent violated Section 507.805(a)(4), "Substantially failed to provide notice of the filing of the labor condition application as required in 507.730(h) of this part" and Section 507.730(a)(1), "Filed a labor condition application with ETA which misrepresents a material fact."

Considering the nature of the two violations in this case and the other relevant factors enumerated at 507.810(c), I am persuaded to reduce the amount of the civil money penalty assessed against Respondent. As the ALJ found, Respondent has no history of violations, a minimal number of workers were potentially affected by the violation, there was no financial gain to Respondent and no demonstrated financial loss or injury to any other party as a result of the failure to notify the union of the labor condition applications, and Respondent has committed to future compliance. Additionally, it is plausible that Respondent acted without the intent to violate the provisions at issue here. In light of these factors, and considering the misunderstanding of the ALJ and Complainant as to the nature of the Act and its purposes at the time of the hearing, I find that a $250 civil money penalty for each violation is appropriate in the circumstances presented here. Ameliorating factors notwithstanding, effective enforcement of the Act is essential to ensure the effectiveness of the labor condition application process and the H-1B visa program. Accordingly, although a civil money penalty is not mandatory, I believe it is appropriate to ensure the viability of the complaint process and future compliance with the Act. Respondent is ordered to pay a total of $500 for the violations committed.

---

[6]    I make no findings herein as to whether Complainant's layoff resulted from new hiring of H-1B nonimmigrants or the extension of H-1B nonimmigrant visas, as this issue is irrelevant to the matter properly before me for consideration, <u>i.e.</u> violation of the notice requirement of labor condition application procedures.

Section 507.855 governs "Notice to Employment and Training Administration and the Attorney General." Pursuant to 8 U.S.C. § 1182(n)(2)(C) and 29 C.F.R. § 507.855(a)(2), the Administrator properly notified the Attorney General and ETA of the ALJ's finding of a violation by Respondent.[7]  Under 507.855(b), the Attorney General upon receipt of such notification, shall not approve petitions filed with respect to that employer during a period of at least one year. Under 507.855(c), ETA shall suspend the employer's labor condition applications upon such notification.

Accordingly, for the reasons discussed herein, the allegation concerning the labor condition application of January 9, 1992 is dismissed, and Respondent must remit a civil money penalty in the amount of $500 by certified check made payable to the "Wage and Hour Division, Labor."

SO ORDERED.

ROBERT B. REICH
Secretary of Labor

Washington, D.C.

---

[7]     Review of the comments made by Senators Kennedy and Simpson on November 26, 1991, in presenting their amendments to the H-1B visa program, while supportive of the position urged by the Union and Respondent that debarment is too harsh a sanction, do not persuade me that this result is incorrect. Both Senators comments on the need to distinguish between an employer's wilful failure and an inadvertent, good faith failure, when determining remedies, specifically refer to wage rates and working conditions in subparagraphs (1) (A) (i) or (ii). 137 Cong. Rec. S18243-S18245 (daily ed. Nov. 26, 1991) (statements of Senators Simpson and Kennedy). These comments are not inconsistent with my reading of the plain language of the INA and the regulations which dictate the result reached herein.

EXHIBIT B

**U.S. Department of Labor**    Administrative Review Board
200 Constitution Avenue, N.W.
Washington, D.C. 20210



In the Matter of:

U.S. DEPARTMENT OF LABOR,                ARB CASE NO. 99-050
ADMINISTRATOR, WAGE & HOUR
DIVISION, EMPLOYMENT STANDARDS           (ALJ CASE NO. 98-ARN-3)
ADMINISTRATION,
                                         DATE: July 31, 2002
              COMPLAINANT,

     v.

BEVERLY ENTERPRISES, INC.,
BEVERLY HEALTH AND REHABILITATION
SERVICES, INC.,

              RESPONDENTS.


BEFORE:    THE ADMINISTRATIVE REVIEW BOARD

Appearances:

For the Complainant:
     Jonathan M. Kronheim, Esq., Steven J. Mandel, Esq., Eugene Scalia, Esq., *U.S. Department
     of Labor, Washington, D.C.*

For the Respondents:
     Julie M. Carpenter, Esq., *Jenner & Block, Washington, D.C.*
     Hugh Reilly, Esq., *Beverly Enterprises, Inc., Fort Smith, Arkansas*


### DECISION AND ORDER OF REMAND

     This case arises under the Immigration Nursing Relief Act of 1989 (INRA or the Act), 8
U.S.C.A. §§ 1101(a)(15)(H)(i)(a) and 1182(m) (West 1999), and raises significant questions as to
the basis and scope of the Department of Labor's authority to investigate possible violations of the
INRA's attestation requirements. We reverse the decision of the Administrative Law Judge (ALJ)
and hold that, under a Department of Labor regulation implementing the INRA, the Administrator
of the Wage and Hour Division (Administrator) has the authority to conduct so called "directed
investigations" without a complaint from an aggrieved party. We also hold that a State Department
telegram transmitted to the Wage and Hour Division constituted a "complaint" from an "aggrieved

party" about a "facility" within the meaning of the Act and that, whether the investigation was directed by the Administrator or was initiated by a complaint, the Administrator was not time barred from completing the investigation or initiating this proceeding.  For these reasons, we remand this case for further proceedings consistent with this decision.

## FACTUAL AND PROCEDURAL HISTORY

Respondent Beverly Enterprises, Inc. operates a network of over 700 health care and nursing facilities in the United States and employs about 70,000 health care professionals and other staff at rehabilitation centers, acute care hospitals, assisted living centers, and other facilities.  Respondent's Motion for Summary Judgment on the Threshold Issues before the ALJ, at 1.

In January 1995 the Wage and Hour Division, U. S. Department of Labor, received a telegram from a Department of State official in the Philippines.  See Joint Stipulation of Facts at attachment 1. The telegram asserted that the Philippines is home to "the world's largest visa fraud post." *Id.* at ¶ 4.  The official asserted that U.S. "petitioners" of registered nurses might be acting unlawfully in their recruitment of foreign nurses under the INRA, and that an investigation was warranted. *Id.* at ¶ 8. The State Department official estimated that more than fifty per cent of these visa recipients ultimately did not work as nurses in the United States, and that if they fail the state nursing examination, which many of them do, they "are farmed out by their petitioners [such as Beverly] as licensed practical nurses (LPN) or as nursing aides." *Id.* at ¶ 2.  The State Department telegram detailed specific charges against Beverly.  "Beverly Enterprises . . . which successfully petitioned 418 Filipino nurses in the past 24 months states in its standard employment agreement" that the nurse will receive less than the prevailing wage for nurses until licensure is obtained.  The telegram further quoted Beverly's agreement as stating "if [licensure is] not successfully achieved, the foreign nurse will be retained by Beverly enterprises of California in the capacity of a nursing assistant at the rate of approximately . . . [$]6.00 per hour." *Id.* at 8.  These charges alleged violations not at just one facility but at all of Beverly's facilities in California.

The telegram goes on to allege a violation by a specific subsidiary of Beverly:

> In a letter to the embassy dated April 15, 1994 the Nurses Exchange of America (the Exchange), a Beverly subsidiary, complains about the denial of an H1A visa to one of its beneficiaries whose papers explicitly stated that she would be retained as a nursing assistant if she failed the state board exam.  The Exchange argument was that it is a de facto situation that most H1A nurses in the U.S. who fail the initial RN exam are either retained as nursing assistants or LVNS/LPNS (if they have also taken this exam) provided their H1A visa is still valid.  The employing petitioners are aware that only about 40 per cent of the foreign-trained nurses would pass the RN exam in the first sitting.

State Department telegram, at ¶ 11.

In April 1995 Wage and Hour notified Beverly that it intended to investigate. As of May 1996, Beverly was refusing to provide documents and information requested because it contested the Wage and Hour Administrator's jurisdiction. On March 13, 1998, the Administrator issued a determination that a basis existed for finding Beverly in violation of the INRA. The Administrator seeks payment of approximately $3,200,000 in back wages and $1,000,000 in civil money penalties. Beverly requested a hearing, and both parties filed motions for summary judgment. In a decision of February 4, 1999, the ALJ granted Beverly's motion and reversed the Administrator's determination, holding that under the "clear and unambiguous language of the statute, the Administrator did not have the authority to conduct a directed investigation." The ALJ also concluded that, because the State Department telegram was not filed by an "aggrieved party" as required by the Act, it therefore did not constitute a "complaint" upon which an investigation could be predicated. Finally, he ruled that because the Administrator's determination occurred beyond the statutory 180-day time period, and that Beverly was thereby prejudiced, the determination was time barred. Recommended Decision and Order (R. D. & O.) at 6, 8, 11. The Administrator petitioned the Administrative Review Board (Board or ARB) for review of the ALJ's decision.

The Administrator argues before the Board that under 20 C.F.R. § 655.400(b)(2001), which states in pertinent part,"[t]he Administrator, *either* pursuant to a complaint *or otherwise,* shall conduct such investigations as may be appropriate" (emphasis added), she has authority to conduct investigations without first receiving a complaint from an aggrieved person or organization. Furthermore, she asserts, the Board should defer to the Administrator's interpretation of the Act, which is supported by the structure of the INRA itself and its legislative history.

The Administrator also urges that the State Department is an "aggrieved party" under 8 U.S.C.A. § 1182(m)(2)(E)(ii), and thus has the authority to file a complaint. The Administrator has routinely initiated investigations on the basis of information provided by the State Department, which, she contends, demonstrates her authority to interpret broadly the "aggrieved party" provision and is, therefore, entitled to deference by the ARB. As an agency administering closely related provisions of the Immigration and Nationality Act, the State Department, according to the Administrator, plays an important role in enforcing the statute. She argues that if the Department of Labor could not initiate investigations on the basis of information provided by the State Department, such preclusion would have a significant impact upon the immigrant nurse program.

Finally, the Administrator contends that the failure of Wage and Hour to meet the 180-day time limit specified in the Act does not deprive the Department of Labor of jurisdiction. She maintains that this question is directly controlled by the Supreme Court's decision in *Brock v. Pierce County,* 476 U.S. 253 (1986).

Respondent Beverly, on the other hand, argues that the language of the statute explicitly restricts the Department of Labor to investigations based on valid complaints. Information provided by another government agency such as the State Department does not constitute a complaint under the Act, Beverly says, because the State Department is not an "aggrieved party" within the meaning of the Act. Finally, Beverly argues that this proceeding is equitably and statutorily time barred.

## JURISDICTION AND SCOPE OF REVIEW

We have jurisdiction of the Administrator's petition for review under 20 C.F.R. § 655.445(a) (2001).[1]  This Board has authority to review the ALJ's factual and legal conclusions *de novo*.  5 U.S.C.A. § 557(b)(West 1996).  *See also Whitaker v. CTI-Alaska, Inc.*, ARB No. 98-036, ALJ No. 97-CAA-15, slip op. at 3 n.4 (May 28, 1999) (ARB's authority to review summary judgment recommendations *de novo*).

## ISSUES PRESENTED

We address the following issues:

1. Whether Department of Labor regulations implementing the INRA provide the Administrator the authority to conduct "directed investigations," that is, investigations initiated without a complaint by an aggrieved party.

2. Whether the State Department telegram constituted a "complaint" by an "aggrieved party" about a "facility" within the meaning of the statute.

3. Whether the INRA requirement that the Administrator shall file a determination within 180 days of receiving a complaint bars her from prosecuting this case.

## DISCUSSION

### I.    Authority to Direct Investigations

Our review of Congressional intent in enacting the INRA, the terms of the Act, and the Secretary of Labor's implementing regulations leads us to conclude that the Administrator has properly asserted her authority to direct investigations whether or not initiated by a "complaint" of an "aggrieved party."

We are mindful that, in H-1A enforcement cases,[2] the role of the ALJ is explicitly circumscribed by a Department of Labor regulation implementing the INRA, which provides, in Subpart E, that "[t]he administrative law judge shall not render determinations as to the legality of a regulatory provision or the constitutionality of a statutory provision . . .." 20 C.F.R. § 655.440(b). *See also Stouffer Foods Corp. v. Dole*, No. 7:89-2199-3, 1990 WL 58502, at * 1 (D.S.C. Jan. 23, 1990) ("Defendant's [Department of Labor's] administrative law judges are bound by Executive Order 11246 and its implementing regulations; they have no jurisdiction to pass on their validity.").

---

[1]    Although this section of the regulations still refers to review by the Secretary of Labor and requires documents to be filed with the former Office of Administrative Appeals, Secretary's Order No. 2-96 delegated authority to the Board to act for the Secretary on petitions for review under the INRA.  Secretary's Order No. 2-96, § 4c (20); 61 Fed. Reg. 19978 (May 3, 1996).

[2]    8 U.S.C.A. § 1101(a)(15)(H)(i)(a).  The last three subparts of this citation have given the immigrant nurse program its "H-1A" moniker.

Likewise, this "Board shall not have jurisdiction to pass on the validity of any portion of the Code of Federal Regulations which has been duly promulgated by the Department of Labor and shall observe the provisions thereof, where pertinent, in its decisions." Secretary's Order No. 2-96, § 4c(20); 61 Fed. Reg. 19979 (May 3, 1996). Accordingly, we do not pass on the validity of the Secretary's implementing regulations in the process of interpreting their meaning as applied to the facts of this case.

To evaluate the Administrator's position that the "or otherwise" regulation permits investigations without a complaint, we do not examine the regulation's language in isolation. Rather, we consider the context in which it was promulgated, notably the statute from which it draws its authority, and the statute's legislative history. In so doing, we

> exhaust the traditional tools of statutory construction . . . and may examine the statute's legislative history in order to shed new light on congressional intent, notwithstanding statutory language that appears superficially clear . . . and must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy making decision . . . to an administrative agency.

*National Rifle Assoc. of America, Inc. v. Reno*, 216 F.3d 122, 127 (D.C. Cir. 2000) (citations omitted).

Because of a nationwide shortage of registered nurses, Congress enacted the INRA in 1989 and sought to regulate the admission of foreign registered nurses to the United States. H. Rep. No. 101-288, 101st Cong., 1st Sess. (1989), *reprinted in* 1989 U.S.C.C.A.N. 1894, 1895. In addressing the nursing shortage and ensuring that the importation of nurses did not adversely affect the labor market, the Act provided for "stricter procedures for future admissions of nurses [with a] penalty structure [that] contemplates maximum flexibility for the admission of aliens . . . and severe penalties for those who fail to meet the terms of the attestation." *Id*. at 1898.

The legislative history of the statute makes it plain that Congress intended the Department of Labor to conduct directed investigations in situations in which there was credible evidence the Act was being violated, but had not received a complaint from a particular aggrieved party. The Chairman of the House subcommittee that considered the bill, Representative Morrison, gave a lengthy explanation of the bill when it was under consideration for passage in the House of Representatives. Representative Morrison explained the enforcement provisions of the bill, saying "[a]lthough the admission requirements are streamlined, the bill provides very structured penalties on employers who make misrepresentations on the attestation or fail to comply with the conditions. Any aggrieved nurse may file a complaint with the Secretary of Labor, *and the Secretary can initiate investigations on its* [sic] *own*." 135 Cong. Rec. H7092-01, H7095 (Oct. 17, 1989) (emphasis added).

The House Judiciary Committee report on the bill that became the INRA states that "[i]nvestigations may be initiated in two instances: (1) *through the Secretary of Labor when there is reasonable cause to believe a facility fails to meet conditions of the attestation*, and (2) upon the filing of a complaint by an aggrieved party." 1989 U.S.C.C.A.N. at 1900 (emphasis added).

Elsewhere in the report, the Committee, in describing the purpose of requiring two notices of the filing of an attestation said "[t]he Committee expects both notices to be provided in a timely fashion so that aggrieved parties *or the Department of Labor* can take appropriate action if terms of the attestation have not been adhered to." *Id.* at 1899 (emphasis added).

This legislative history, in effect, spoke to precisely the situation giving rise to this case. That is, Congress expected the Secretary to take action to implement the "severe penalty" provisions of the Act when she receives a detailed statement of alleged violations from a highly credible source such as the State Department, which had concluded that "the H1A program is being used as a vehicle for large-scale immigration fraud." Department of State telegram, Section 15, ¶ 1; Joint Stipulation of Facts, at attachment 1.

Under the provisions of the Act, to qualify for admission to the United States, the alien must have "passed an appropriate examination . . . or [have] a full and unrestricted license under State law to practice professional nursing in the State of intended employment . . .[,]" 8 U.S.C.A. § 1182(m)(1)(B), and must be "fully qualified and eligible under the laws . . . governing the place of intended employment to engage in the practice of professional nursing as a registered nurse immediately upon admission to the United States." 8 U.S.C.A. § 1182(m)(1)(C). Any facility seeking to employ the foreign registered nurses must file an attestation with the Secretary of Labor that, among other things, the alien nurses will be paid the same wages as the registered nurses already employed there. 8 U.S.C.A. § 1182(m)(2)(A)(iii).

In order to process and investigate any charges that a facility has not met the conditions or misrepresented facts contained in its attestation, the INRA requires the Secretary to establish certain procedures:

> (ii) The Secretary of Labor shall establish a process, including reasonable time limits, for the receipt, investigation, and disposition of complaints respecting a facility's failure to meet conditions attested to or a facility's misrepresentation of a material fact in an attestation. Complaints may be filed by any aggrieved person or organization (including bargaining representatives, associations deemed appropriate by the Secretary, and other aggrieved parties as determined under regulations of the Secretary). The Secretary shall conduct an investigation under this clause if there is reasonable cause to believe that a facility fails to meet conditions attested to. Subject to the time limits established under this clause, this subparagraph shall apply regardless of whether an attestation is expired or unexpired at the time a complaint is filed.

8 U.S.C.A. § 1182(m)(2)(E)(ii).

The Secretary is to make a determination, within 180 days after the complaint is filed, whether a basis exists to make a finding that there was a misrepresentation of material fact or failure to meet a condition in the attestation:

> (iii) Under such process, the Secretary shall provide, within 180 days after the date such a complaint is filed, for a determination as to whether or not a basis exists to make a finding described in clause (iv). If the Secretary determines that such a basis exists, the Secretary shall provide for notice of such determination to the interested parties and an opportunity for a hearing on the complaint within 60 days of the date of the determination.

8 U.S.C.A. § 1182(m)(2)(E)(iii).

If the Secretary finds, after notice and opportunity for a hearing, that the facility has failed to meet a condition attested to or that there was a misrepresentation of material fact in the attestation, she may impose administrative remedies, including civil money penalties:

> (iv) If the Secretary of Labor finds, after notice and opportunity for a hearing, that a facility (for which an attestation is made) has failed to meet a condition attested to or that there was a misrepresentation of material fact in the attestation, the Secretary shall notify the Attorney General of such finding and may, in addition, impose such other administrative remedies (including civil monetary penalties in an amount not to exceed $1,000 per nurse per violation, with the total penalty not to exceed $10,000 per violation) as the Secretary determines to be appropriate. Upon receipt of such notice, the Attorney General shall not approve petitions filed with respect to a facility during a period of at least one year for nurses to be employed by the facility.

8 U.S.C.A. § 1182(m)(2)(E)(iv).

The Act also provides that the Secretary shall order the facility to provide for payment of such amounts of back pay as may be required to comply with the facility wage rate requirement of the attestation:

> In addition to the sanctions provided for under clause (iv), if the Secretary of Labor finds, after notice and an opportunity for a hearing, that a facility has violated the condition attested to under subparagraph (a)(iii) (relating to payment of registered nurses at the facility wage rate), the Secretary shall order the facility to provide for payment of such amounts of back pay as may be required to comply with such condition.

8 U.S.C.A. § 1182(m)(2)(E)(v).

The above-quoted language of the Act does not clearly and explicitly restrict the Secretary to investigations based only on valid complaints. Contrary to the ALJ's finding and Respondent Beverly's contention, the statute offers several possible interpretations. For instance, subsection (iv)

can be read as authorizing the Administrator to make findings independent of the complaint process set out in subsection (ii) of § 1182(m)(2)(e). Unlike subsection (iii), which clearly references the complaint process and is thereby restricted by that process, (iv) contains no such limiting language.

An alternative interpretation of the Administrator's authority to investigate and determine violations may be found in the third sentence of subsection (ii). This language can be read to require the Administrator to conduct investigations, apart from the complaint process, "if there is reasonable cause to believe that a facility fails to meet conditions attested to." 8 U.S.C.A. § 1182(m)(2)(E)(ii).

The Board believes that the intent of Congress with regard to the Secretary's authority has been carried out in the Department of Labor's rulemaking. Congress explicitly granted rulemaking authority to the Secretary under the INRA. Section 3(c)(1) of the INRA directed the Secretary to publish regulations to carry out the purpose of the Act:

> The Secretary of Labor (in consultation with the Secretary of Health and Human Services) shall (1) first publish final regulations to carry out section 212(m) [8 U.S.C.A. § 1182(m)] of the Immigration and Nationality Act (as added by this section) not later than the first day of the 8th month beginning after the date of the enactment of this Act . . ..

Pub. L. 101-238, 8 U.S.C.A. § 1182(m) note.

Those implementing regulations delegate all of the Secretary's investigative and enforcement functions to the Administrator. 20 C.F.R. § 655.400(a). Furthermore, giving effect to the legislative intent that "investigations may be initiated . . . through the Secretary of Labor when there is reasonable cause to believe a facility fails to meet conditions of the attestation, [or] . . . upon the filing of a complaint by an aggrieved party," 1989 U.S.C.C.A.N. at 1900, the implementing regulations provide:

> The Administrator, *either* pursuant to a complaint *or otherwise*, shall conduct such investigations as may be appropriate and, in connection therewith, enter and inspect such places and gather such information as deemed necessary by the Administrator to determine compliance regarding the matters to which a health care facility has attested under section 212(m) of the INA (8 U.S.C. § 1182(m)) and subparts D and E of this part.

20 C.F.R. § 655.400(b) (emphasis added).

Judicial analyses of the scope of agency authority to interpret statutory language guide us in interpreting the "or otherwise" regulation. Where, as here, Congress has not spoken explicitly on a particular question in a statute, or if the statutory language is ambiguous, a court will defer to a reasonable interpretation placed on the language by the agency charged with enforcement of the

statute.  As the Supreme Court explained in *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*,

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions.  First, always, is the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

467 U.S. 837, 842-43 (1984).

In *Mead v. United States,* 533 U.S. 218 (2001), the Court elaborated on *Chevron*:

> [A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.  Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

*Id.* at 226-27.

In arriving at his decision that the Administrator does not have the authority to conduct an investigation without a complaint, the ALJ first interpreted the INRA statute and ruled, in effect, that the complaint by an aggrieved party process is the only authorized method for an investigation.  R. D. & O. at 5.  The judge conceded the "possibility" of prosecuting the allegations in the absence of a complaint, but then rejected the validity of the Secretary's rule because, he claimed, the statute is unambiguous and "prevails" where there is a conflict between it and a regulation.  R. D. & O. at 8.  The ALJ seemed to recognize his limited authority to rule on the legality of the regulation and stated that "interpretation . . . can be accomplished . . .without ruling on the validity of the regulations."  But the ALJ's conclusion in effect invalidated the regulation or at least gave no meaning to its "or otherwise" language.  R. D. & O. at 4, 8.  We find this constituted error.

We conclude that by promulgating the regulation stating, "[t]he Administrator, *either* pursuant to a complaint *or otherwise*, shall conduct such investigations as appropriate," (emphasis added), the Secretary unmistakably interpreted the statute consonant with Congress' intent that the Department should act, complaint or not, when a facility is alleged to be violating the terms of its

attestation or to be misrepresenting material facts. Beverly's construction of the statute and regulation would have the U. S. Department of Labor stand idly by, despite having received, as here, serious allegations from a credible source. Such a reading of the statute and regulation is hardly reasonable. Deference is due to the Administrator's interpretation and implementation of the "or otherwise" regulation, since the Administrator is charged with enforcing the Act. An interpretation to the contrary would render the language mere surplussage and would be inconsistent with Congressional intent. For these reasons, we hold that the words "or otherwise" in the regulation authorize "directed investigations," and that the Administrator could initiate the investigation in this case based upon the allegations in the State Department telegram, even if the telegram did not constitute a complaint under the INRA.

## II.     Complaint by an Aggrieved Party about a Facility

Although we have held that the Administrator had the authority to direct the investigation and seek payments from Respondent Beverly, we also address the ALJ's ruling that the Department of State was not an "aggrieved party." R. D. & O. at 6. We reverse the ALJ and hold that the U. S. Department of Labor's receipt of a telegram from a Department of State official in the Philippines that mentioned Beverly by name constituted a "complaint" by an "aggrieved party" about a "facility."

Under the INRA, "any aggrieved person or organization" may file a "complaint" about a "facility:"

> (ii) The Secretary of Labor shall establish a process, including reasonable time limits, for the receipt, investigation, and disposition of complaints respecting a facility's failure to meet conditions attested to or a facility's misrepresentation of a material fact in an attestation. Complaints may be filed by any aggrieved person or organization (including bargaining representatives, associations deemed appropriate by the Secretary, and other aggrieved parties as determined under regulations of the Secretary).

8 U.S.C.A. § 1182(m)(2)(E)(ii).

### A.     Complaint

We first address whether the telegram was a "complaint" about a "facility." The Secretary's regulations describe "complaint:"

> No particular form of complaint is required, except that the complaint shall be written or, if oral, shall be reduced to writing by the Wage and Hour Division official who receives the complaint. The complaint shall set forth sufficient facts for the Administrator to determine what part or parts of the attestation or regulation allegedly have been violated.

20 C.F.R. § 655.405(b).

Under the terms of 20 C.F.R. § 655.405(b), the telegram was a "complaint." It asserted that "the H1A [sic] program is being used as a vehicle for large-scale immigration fraud." See Joint Stipulation of Facts at attachment 1, at ¶ 15. The State Department telegram estimated that more than fifty per cent of these visa recipients ultimately did not work as nurses in the United States. *Id.* at ¶ 2. It claimed that many of the H-1A visa recipients fail state licensing exams and are "farmed out" by organizations that petition for their admission to the United States as licensed practical nurses or nursing aides. *Id.* The State Department telegram detailed specific charges against Beverly which, if true, constituted clear violations of the INRA, and its implementing regulations: "Beverly Enterprises . . . which successfully petitioned 418 Filipino nurses in the past 24 months states in its standard employment agreement" that the nurse will receive less than the prevailing wage for nurses until licensure is obtained. The telegram further quoted Beverly's agreement as stating "if [licensure is] not successfully achieved, the foreign nurse will be retained by Beverly Enterprises of California in the capacity of a nursing assistant at the rate of approximately . . . [$]6.00 per hour." *Id.* at ¶ 8. These charges asserted violations not at just one facility but at all of Beverly's facilities in California. The telegram also claimed a possible violation by Beverly's subsidiary, the Nurses Exchange of America, which admitted that "[t]he employing petitioners are aware that only about 40 per cent of the foreign-trained nurses would pass the RN exam in the first sitting." *Id.* at ¶ 11. Therefore, the State Department telegram was a "complaint" since it alleged large-scale immigration fraud and widespread violations of the INRA, and it levied specific charges against Beverly and its subsidiaries of regularly violating the INRA by employing H-1A nurses as nursing assistants and paying less than the wage for registered nurses.

The State Department telegram's recital of facts concerning the amount of payment under Beverly's agreement with the nurses is sufficient for a determination that Beverly and its subsidiaries allegedly violated 20 C.F.R. § 655.310(f) ("The facility employing or seeking to employ the alien shall attest that the alien employed by the facility will be paid the wage rate for registered nurses similarly employed by the facility.").[3] It is also sufficient for a determination that Beverly's attestation on this point was allegedly violated. Moreover, the facts in the telegram concerning the inability of the nurses to qualify for licensure are sufficient to constitute allegations of possible violations of 20 C.F.R. §§ 655.300, 655.302 and 655.310, under which the filing and attestation process is to be used to admit alien nurses who meet the qualifications of the statute and regulations ("In order to qualify under this definition of 'nurse' the alien shall . . . (3) be fully qualified and eligible under the laws . . . governing the place of intended employment to practice as a registered nurse immediately upon admission to the United States . . .." 20 C.F.R. § 655.302). Thus, the telegram set forth sufficient facts for the Administrator to determine what part or parts of the attestation and regulation allegedly had been violated.

---

[3]    The regulations required the facility to pay each nurse the higher of the prevailing wage for the occupation in the geographic area or the facility wage. 20 C.F.R. § 655.310(f). The requirement for payment of the prevailing wage was struck down by the federal district court in *Beverly Enterprises v. Herman*, 119 F. Supp. 2d 1 (D.D.C. 2000). The requirement for payment of the facility wage rate for registered nurses remains unaffected.

B.      **Facility**

The telegram also concerned one or more "facilities:"  Beverly Enterprises and the Nurses Exchange, a Beverly subsidiary.  Under 20 C.F.R. § 655.302, a "facility" means "a user of nursing services and includes an employer of registered nurses which provides health care services in a home or other setting, such as a hospital, nursing home or other site of employment not owned or operated by the employer (*e.g.*, a visiting nurse association or a nursing contractor)."  Beverly Enterprises, Inc. employs about 70,000 health care professionals and other staff at rehabilitation centers, acute care hospitals, and assisted living centers in a network of over 700 health care and nursing facilities that it operates in the United States.   Respondent's Motion for Summary Judgment in the Threshold Issues before the ALJ at 1.  Beverly and its subsidiary are thus users of nursing services and employers of registered nurses who provide health care services.  Additionally, attestations may only be filed by "facilities," and Beverly filed such attestations.  Beverly and its subsidiaries are therefore "facilities."

C.      **Aggrieved Party**

Since we are satisfied that the State Department telegram was a "complaint" about "facilities" within the terms of the Act, we turn to whether the Department of State should be considered an "aggrieved person or organization" within the meaning of 8 U.S.C.A. § 1182(m)(2)(E)(ii).  Because we hold that it should, we reverse the ALJ.

The INRA does not define "aggrieved person or organization," but it provides examples: "bargaining representatives, associations deemed appropriate by the Secretary, and *other aggrieved parties* . . .. 8 U.S.C. § 1182(m)(2)(E)(ii)(emphasis supplied).  As used, "aggrieved part[y]" appears to be interchangeable with an "aggrieved person or organization" that may initiate a complaint.  The Secretary has not promulgated regulations defining "aggrieved parties" for purposes of the H-1A program.  We therefore look outside the statutory and regulatory scheme of the Act for interpretive guidance on the meaning of "aggrieved party" and "aggrieved person or organization."

An administrative agency may admit a party to its proceedings when doing so would assist the agency in carrying out its Congressional mandate for administering the statute under which the proceeding arises.  For example, in *Koniag, Inc., Village of Uyak v. Andrus*, 580 F.2d 601 (D.C. Cir. 1978), Department of the Interior regulations provided that any "party aggrieved" could appeal an area director's decision to an ALJ who would then conduct a *de novo* hearing and make a recommended decision to an administrative board.  Two sub-agencies, rather than the groups more directly affected, appealed a decision of the area director to the board.  The Court of Appeals held that these agencies had standing to file an administrative appeal.  The court reviewed Congressional intent, construed "party aggrieved" broadly in the light of that intent, and deferred to the Department of the Interior on who could raise an appeal to the board:

> [T]he term "party aggrieved" must be construed generously to achieve the congressional objective that determinations be careful as well as quick.  We conclude, therefore, that grafting strict judicial standing

requirements onto these regulations would be inconsistent with the act and the Secretary's plan to implement it.

*Id*. at 606.

Concurring, Judge David Bazelon stated that "administrative standing should be determined in light of the functions of an administrative agency, and whether a would-be participant would contribute to fulfilling those functions." 580 F.2d at 611. Contrasting administrative standing with standing to sue in court, Judge Bazelon wrote that neither the "case or controversy" requirements, nor the "prudential rules" of judicial standing apply to administrative agencies. Specifically with respect to the "zone of interests" test (one of the prudential rules), relied upon by Respondent Beverly, Judge Bazelon said:

> [P]rudential limitations reflect a concern about the limited authority and competence of the judiciary in setting general policy. . .. Administrative agencies, on the other hand, derive their powers from Congress . . .. Although this delegation of power is subject to limitations, an agency has unquestioned authority to set general policies affecting large numbers of people when it acts within the scope of its statutory mandate.

*Id*. at 613. *See also Gettman v. Drug Enforcement Admin.*, 290 F.3d 430, 433 (D.C. Cir. 2002) (discussing distinction between administrative standing and judicial standing; holding that "[p]etitioners may be 'interested part[ies]' under the statute, and therefore able to petition the agency, and yet not have Article III standing to bring this action in federal court."); *Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n*, 194 F.3d 72, 74 (D.C. Cir. 1999) ("The criteria for establishing 'administrative standing' . . . [are] less demanding than the criteria for 'judicial standing.'"); *Ingalls Shipbuilding Div. Litton Systems, Inc. v. White*, 681 F.2d 275 (5th Cir. 1982)(discussing administrative standing of Director, OWCP, to intervene in review of a settlement before the Benefits Review Board); *Pennzoil Co. v. F.E.R.C.*, 645 F.2d 360, 391 (5th Cir. 1981) (pipeline customers deemed parties in interest); *Gardner v. FCC*, 530 F.2d 1086, 1090 (D.C. Cir.1976) ("The agencies' responsibility for implementation of statutory purposes justifies a wider discretion, in determining what actions to entertain, than is allowed to the courts by either the constitution or the common law."). *Cf., Vermont Agency of Natural Resources v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000) (articulating the requirements for judicial standing). In short, "administrative standing" to appear before or challenge an administrative agency's decisions in the administrative adjudication context is far less rigorous a test than "standing" under the "case or controversy" provisions of the Constitution or the judicially created "prudential considerations" analysis.

Having reviewed "aggrieved party" in terms of standing to participate in administrative proceedings, we return to the question of whether the State Department should be considered an "aggrieved party" or "aggrieved person or organization" for the purpose of initiating an INRA complaint. In *Koniag,* the court of appeals construed Congressional intent broadly to include the right of a federal agency to appear before an agency board as an "aggrieved party." We adopt the *Koniag* approach here. The INRA requires the Secretary of Labor to "establish a process for the receipt, investigation, and disposition of complaints [which] may be filed by any aggrieved person

or organization . . . ." 8 U.S.C. A. § 1182(m)(i)(E)(ii). As a Federal agency with responsibility for preventing improper entry into the United States, the State Department alleged large-scale immigration fraud and widespread violations of the INRA. The Administrator, who has been delegated the authority of the Secretary under the INRA, has determined that accepting a complaint from another federal agency such as the State Department would materially assist the Department of Labor in carrying out its enforcement responsibilities as Congress directed. 8 U.S.C.A. § 1182(m)(2)(E). In addition, under the INRA, the State Department is required to determine whether applicants for H-1A visas meet the statutory requirements and must reject applications from any person whom a consular officer "knows or has reason to believe . . . is ineligible to receive a visa." 8 U.S.C.A. § 1201(g). If a petitioner is in violation of the attestations required for admission of nonimmigrant aliens under the INRA, the Attorney General may not approve petitions for the admission of nonimmigrant nurses and the State Department would not be permitted to grant them visas. 8 U.S.C.A. § 1182(m)(2)(E)(iv). The State Department, thus, is like the two sub-agencies in *Koniag,* which were given administrative standing to appeal under the "aggrieved party" language, based on their enforcement mandates. *Koniag,* 580 F.2d at 605, 607.

Under *Koniag,* therefore, permitting the State Department to file a complaint to initiate an investigation, *i.e.,* giving a broad interpretation to the term "aggrieved person or organization," serves the purposes of the INRA of protecting domestic labor markets and assuring proper compensation to alien nurses, as well as preventing ineligible aliens from entering the country. *See Beverly Enterprises, Inc. v. Herman.* 119 F.Supp.2d 1, 12 (D.D.C. 2000). Active participation by the State Department in the investigative process under the INRA clearly contributes to the Department of Labor's fulfillment of its INRA functions. *See Koniag,* 580 F.2d at 611. However, unlike the situation in *Koniag,* we are not reviewing the State Department's right to participate in an agency adjudication. Rather, we view the State Department's role here as merely that of a reliable informant. If, as it does, the case law would permit the State Department to participate as an "aggrieved party" in an agency proceeding, then it is logical to accord the State Department "aggrieved person or organization" status solely for the purpose of initiating a complaint. We reach that decision here and reverse the ALJ's conclusion that denied the State Department "aggrieved party" status.

In ruling that the State Department qualifies as an "aggrieved party," we agree with the Administrator, but on different grounds. The regulations implementing the H-1B program (applying similar requirements to aliens seeking to enter the United States for other occupations, 8 U.S.C.A. § 1101(a)(15)(H)(i)(b)) explicitly provide that the term "aggrieved party" includes a "government agency which has a program that is impacted by the employer's alleged non-compliance with the labor condition application." 20 C.F.R. § 655.715. Because both sections of the Immigration and Nationality Act use the same term, "aggrieved party," to define parties who may file a complaint, because the two sections appear consecutively in the statute, and because "identical words used in different parts of the same act are intended to have the same meaning," the Administrator argues that the definition of "aggrieved person" under the H-1B regulations should "guide" interpretation of that term under the H-1A program. The Administrator suggests that the Board should rule that "aggrieved person" has the same meaning under both sections and that such a ruling, as an adjudicative interpretation by a policy-making agency, would be entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984). The Administrator also relies on a decision by another Department of Labor ALJ, in very similar circumstances to these, that

the Administrator may initiate an investigation based on a complaint from the State Department.  *See Administrator v. Alden Management Service, Inc.*, ALJ No. 1996-ARN-3, slip op. at 5-6 (ALJ Nov. 3, 1998) ("The Department of Labor, Department of State and the Immigration and Naturalization Service work together to administer the H-1A program.  If the Respondent's argument that the telegram [from the State Department] is not an aggrieved person was accepted, it would force each of these agencies in many circumstances to turn a blind eye to alleged violations of law discovered by the other agencies administering the Act.").

The ALJ here declined to accept the Administrator's position, holding that, because the H-1A and H-1B programs were enacted separately, and the Secretary never promulgated regulations defining "aggrieved party" under H-1A, the H-1B regulatory definition of aggrieved party cannot be applied to the H-1A program.  R. D. & O. at 6.  We do not decide whether the H-1B definition of "aggrieved person" that includes another "government agency" should be imported into H-1A to determine its meaning, since we have held that the State Department qualifies as an "aggrieved person or organization" on another basis.

However, we do address the ALJ's rejection of the conclusion by ALJ Tureck in *Alden Management Services, Inc.,* that, because the Departments of Labor and State work together in administering the H-1A program, it would violate Congressional intent to hold that the Department of Labor could not act on information supplied by Department of State.  *See Alden*, slip op. at 5-6.  Employing the test for judicial, rather than administrative standing, the ALJ here held that the State Department was not an aggrieved party because its "enforcement interest," namely, its ability to investigate visa and immigration fraud independent of the Department of Labor, would not be impaired if it could not initiate Department of Labor investigations by filing a complaint under the INRA and it therefore did not fall within the "zone of interests" protected by the statute.  The ALJ also concluded that the State Department telegram was not a "complaint" within the meaning of the statute because State was not an "aggrieved party."  R. D. & O. at 6.  Because we distinguish judicial from administrative standing for the reasons already stated, we reject the ALJ's rationale that the proper test is one of judicial standing, and hold that the State Department is an "aggrieved person or organization" for the purposes of initiating a complaint under the INRA.

Furthermore, the Board finds the Respondents' arguments about standing unpersuasive. Beverly argues that the State Department telegram was not a complaint from an aggrieved party under the INRA. Because the statute authorizes the Secretary to issue regulations specifying those who constitute an "aggrieved party" but the Secretary has not done so, Beverly asserts the Administrator's interpretation of the term is not entitled to deference.  As noted, we have not addressed that issue, because we have determined that the State Department is an "aggrieved party" on other grounds.  Beverly also claims that the term "aggrieved party" is a term of art designating those who have "standing" to challenge agency action either before the agency or in court.  More particularly, Beverly contends that the crucial determination is whether the party in question comes within the "zone of interests" protected by the statute.  Moreover, Beverly says, the Administrator's point that the "zone of interests" test does not apply in administrative hearings is contrary to settled law.

The cases Beverly cites do not support the propositions for which they are cited, inasmuch as they are decided on principles of judicial, as distinct from administrative, standing.  Beverly urges the Board to find that the Supreme Court's decision in *Director, Office of Workers' Compensation*

*Programs v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122 (1995) controls here. *Newport News Shipbuilding* is distinguishable. The issue was whether the Director of the Office of Workers' Compensation Programs had standing to appeal the denial of disability benefits by the Department of Labor's Benefits Review Board to the U.S. Court of Appeals, when the worker himself declined to pursue the claim. Pursuant to the Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C.A. § 901 *et seq.* (West 2001), only a "person adversely affected or aggrieved" by the Board's order could appeal. 33 U.S.C.A. § 921(c)(West 2001). The Court found no authority for the proposition that the "policy interest" of "ensuring adequate compensation payments to claimants," 514 U.S. at 129, 132, was sufficient to establish judicial standing. The court reasoned that the Administrative Procedure Act (APA), 5 U.S.C.A. § 551(2)(West 1996), did not include agencies within the category of "person adversely affected or aggrieved" and when a federal agency is meant to have standing to seek judicial review, Congress specifically so provides. *Id.* at 130.

Later in the opinion, the Court discussed the standards applicable in assessing whether a party has standing to seek *judicial* review of agency action, *i.e.*, whether the party is injured in fact by agency action and whether "the interest he seeks to vindicate is arguably within the 'zone of interests' to be protected or regulated by the statute in question." *Id.* at 127. The Court held that an agency acting in its governmental capacity was not a "person adversely affected or aggrieved" under the APA. 514 U.S. at 130. However, *Newport News Shipbuilding* is readily distinguishable from this case, because the Court there was concerned with whether an administrative agency had standing to seek *judicial review* of a ruling of another administrative body, not with the distinct question here whether an agency has "*administrative standing*" to file a complaint initiating an investigation.

Beverly asserts that the Supreme Court's decision in *Lujan v. National Wildlife Federation,* 497 U.S. 871 (1990), holds that the "zone of interests" test for standing to seek judicial review applies to standing in administrative proceedings. Respondent's Memorandum at 22. But there was no administrative proceeding at issue at all in *Lujan*; the National Wildlife Federation filed an action in district court challenging the Department of the Interior's actions under the Federal Land Policy Management Act of 1976 and the National Environmental Policy Act of 1969. 497 U.S. at 875. The Court's entire discussion of standing revolved around the APA's *judicial* review provision, 5 U.S.C.A. § 702.

The holding in *Ecee, Inc. v. Federal Energy Reg. Comm'n*, 645 F.2d 339 (5th Cir. 1981), cited by Beverly, would not preclude the State Department's participation in this case. The Fifth Circuit held that the FERC could confer standing in administrative adjudications on parties that did not have a "legally cognizable interest" for purposes of judicial standing under the APA, relying on the same reasoning as in the cases discussed above and citing Judge Bazelon's concurring opinion in *Koniag*. 645 F.2d at 349-50.

## III.    Investigation and Determination within 180 Days

Finally, we hold that, whether the investigation was directed by the Administrator or initiated by a complaint, it was not time barred because it was not completed within 180 days.

The ALJ found that the Administrator did not complete this investigation and issue a determination within 180 days as required by the statute and regulation[4] and that, therefore, the Administrator's action was "time-barred . . .." R. D. & O. at 9-11. He rejected the Administrator's argument that, under *Brock v. Pierce County,* 476 U.S. 253 (1986), the 180-day period was only directory, not mandatory, because he found that this case concerned "private" not "public rights." R. D. & O. at 10. The ALJ held that where "private" rights are involved, time limits have been held to be "directory" only after a court considered the congressional purpose behind the legislation, and whether the respondent was prejudiced by the failure to comply with the time limit. He held that "the primary rights at issue here are those of the private nurses." *Id.* He found that this case, unlike *Pierce County*, did not involve recovery of misspent government funds but rather the Congressional purpose was to "alleviat[e] the national shortage of registered nurses." *Id.* He also found that Beverly "was significantly prejudiced by the delay in the completion of the investigation." *Id*. at 11. We disagree.

We note at the outset of this discussion that the 180-day limitation for the Administrator to investigate and make determinations under the INRA appears to apply only to investigations prompted by the complaint of an aggrieved person or organization.[5] Nevertheless, in order to avoid any ambiguity in light of today's decision concerning directed investigations, we find that the Administrator's authority to conduct directed investigations and issue subsequent determinations is also not subject to the 180-day limitation.

The ARB decision in *U.S. Department of Labor v. Nurses PRN of Denver*, ARB No. 97-131 (June 30, 1999) controls the resolution of this issue. In that case, an investigation was initiated on the basis of a complaint from an aggrieved organization. After the Board remanded for a determination of whether the Respondent Hospital had properly paid its non-H-1A nurses the prevailing wage, the hospital opposed the Administrator's further discovery on grounds that it was well past the 180-day time limit for completion of the investigation. The Board rejected that argument. It held:

> The 180-day limitation for conducting investigations at issue in the instant case carries none of the indicia that would divest the Administrator of the authority to investigate after expiration of the limitation. While their language may be mandatory, the statutory and regulatory provisions imposing the investigatory time limitation nowhere specify the consequences of a failure to meet the limitation. Ordinarily, if there is congressional or administrative intent to foreclose action in the event that a time limitation is not met, the statute or regulations specify consequences that flow from the failure to meet the limitation. *Brock v. Pierce County*, 476 U.S. 253, 259 (1986) (parallel limitations without specified consequences in Comprehensive Employment and Training Act and implementing

---

[4]    8 U.S.C.A. § 1182(m)(2)(e)(iii); 20 C.F.R. § 655.405(c), (d).

[5]    8 U.S.C.A. § 1182(m)(2)(E)(iii) ("Under this process," referring to (E)(ii), the complaint by an aggrieved party subsection of the INRA); 20 C.F.R. § 655.405 (c), (d).

regulations were "intended to spur the Secretary to action, not to limit the scope of his authority"). Nothing in the legislative or regulatory history of the matters at issue here suggests an intent to bar agency action beyond the limitations period. Conducting an investigation and issuing a determination may pose unanticipated difficulties, and the ability of the Administrator to meet the limitation may be subject to factors beyond his control. Absent any statement of contrary intent, such a limitation provides a projected timetable for agency action on a given complaint, rather than curtailing the agency's authority to resolve complaints if the time limitation is not met. Mandatory language that an agency "shall" act within a limitations period, standing alone, "does not divest [the agency] of jurisdiction to act after that time."

Slip op. at 8-9.

Because of the authority of *Nurses PRN of Denver*, we do not feel compelled here to thoroughly address the ALJ's rationale for finding that the Administrator is barred by the time limitation. We do, however, disagree with the notion that this matter involves, primarily, private rights. The purpose of the INRA, "to alleviate the shortage of registered nurses," itself demonstrates a public interest in assuring high quality health care in the United States. The House Report on the legislation cited a report by the Secretary's Commission on Nursing (of the Department of Health and Human Services) that there was a shortage of over 137,000 nurses in hospitals and nursing homes alone, and that "[t]hese shortages have forced some hospitals, both urban and rural, to close beds and occasionally entire wings." 1989 U.S.C.C.A.N. at 1895. Also, discussing a companion provision in the bill that would allow certain foreign nurses already in the country to adjust to permanent resident status, the Report said "[m]any of the nurses affected by this legislation work in critical care and emergency service units and their leaving would have a profound effect on the quality of health care delivered to critically ill patients." *Id.* at 1895. Admission of alien nurses to alleviate the shortage of nurses also would have a significant effect on the quality of health care in the United States.

The Secretary's authority to impose civil money penalties also clearly indicates that public interests are involved. Such penalties do not inure to the benefit of any specific individual but act as a deterrent to prevent future violations of the act. 8 U.S.C.A. § 1182(m)(2)(E)(iv). *See U.S. v. LTV Steel Co., Inc.,* 269 B.R. 576, 583 (W.D. Pa. 2001). *Cf., U. S. v. General Motors Corp.,* 403 F. Supp. 1151, 1163 (D. Conn. 1975). In addition, securing back pay for nurses who were not paid the facility wage protects not only the interests of individual nurses in receiving the pay to which they were statutorily entitled, but protects domestic labor markets from the depressing effect of paying alien nurses below facility rates. *See Beverly Enterprises, Inc. v. Herman,* 119 F. Supp. 2d 1, 11(D. D. C. 2000).

Thus, the INRA requirement that the Administrator shall file a determination within 180 days of receiving a complaint does not bar her from prosecuting this case.

## CONCLUSION

For the reasons discussed above, we hold that the Department of Labor regulations implementing the INRA authorize directed investigations without a complaint from an aggrieved person where the Administrator has reason to believe a violation of the INRA has occurred. We also hold that the State Department is an "aggrieved person" under the Act and that its telegram qualifies as a complaint. Finally, we hold that the Administrator is not limited to 180 days to investigate and determine whether violations of the attestation have occurred.

Accordingly, we **REMAND** this matter to the Administrative Law Judge for further proceedings consistent with this order.

**SO ORDERED.**

> **OLIVER M. TRANSUE**
> Administrative Appeals Judge
>
> **WAYNE C. BEYER**
> Administrative Appeals Judge
>
> **JUDITH S. BOGGS**
> Administrative Appeals Judge

EXHIBIT C

**U.S. Department of Labor**
Administrative Review Board
200 Constitution Ave, NW
Washington, DC 20210

**ARB CASE NO. 97-131**
**ALJ CASE NO. 94-ARN-1**
**DATE: June 30, 1999**

In the Matter of:

**U.S. DEPARTMENT OF LABOR,**
**ADMINISTRATOR, WAGE AND HOUR**
**DIVISION, EMPLOYMENT STANDARDS**
**ADMINISTRATION,**
   **PLAINTIFF,**

   **and**

**NURSES PRN OF DENVER, INC.,**
**NURSES PRN SUNCOAST, INC.,**
   **COMPLAINANTS,**

   **v.**

**HCA MEDICAL CENTER HOSPITAL,**
**LARGO, FLORIDA,**
   **RESPONDENT.**

BEFORE: THE ADMINISTRATIVE REVIEW BOARD

**Appearances:**

*For the Plaintiff*:

   Steven J. Mandel, Esq., William J. Stone, Esq., Paul Frieden, Esq.
   Carol Arnold, Esq., *U.S. Department of Labor, Washington, D.C.*

*For the Respondent*:

   Wendolyn S. Busch, Esq., Kip P. Roth, Esq., *Trenam, Kemker, Scharf, Barkin, Frye, Oneill & Mullis, Tampa, Florida*

### SECOND ORDER OF REMAND

   This complaint was brought pursuant to the Immigration Nursing Relief Act of 1989, 8 U.S.C. §§1101(a)(15)(H)(i)(a) and 1182(m) (1994) (INRA) and implementing regulations,

---

[Page 2]

---

29 C.F.R. Part 504, Subparts D and E (1995); 20 C.F.R. Part 655, Subparts D and E (1998).[1] The Complainants in this matter, Nurses PRN of Denver, Inc., and Nurses PRN Suncoast, Inc. (the contractors), are companies that provide temporary nursing services to health

care facilities. The Respondent, HCA Medical Center Hospital, Largo, Florida (the hospital), is an adult acute care hospital that specializes in cardiology and provides facilities for open heart surgery. At one time, the contractors had supplied temporary nurses to the hospital, but this arrangement ended in 1989, several years prior to the filing of the complaint. The U.S. Department of Labor Administrator, Wage and Hour Division, Employment Standards Administration (Administrator) also is a party to this proceeding as the Plaintiff.

The INRA was designed to alleviate a national shortage of registered nurses by admission of foreign registered nurses (H-1A nonimmigrant alien nurses) to work in the United States. Admission of foreign nurses was dependent on attestations by participating health care facilities, including a certification that foreign nurses were needed for the delivery of patient care,[2] that employment of foreign nurses would not have an adverse effect on the wages and working conditions of U.S. nurses, and that the health care facility was taking steps to recruit and retain U.S. nurses so as to reduce reliance on foreign nurses. 8 U.S.C. §1182(m)(2)(A). Facilities which fail to meet conditions of the attestation, or which misrepresent material facts in an attestation, are subject to administrative remedies, disapproval of subsequent attestation petitions, and back pay liability. 8 U.S.C. §1182(m)(2)(E)(iv) and (v).

The contractors filed a complaint alleging that the hospital had misrepresented attestation elements when it hired foreign nurses through the H-1A visa program. The Administrator investigated the complaint and issued a determination; this determination was contested by both the contractors and the hospital. An Administrative Law Judge (ALJ) then convened a hearing and issued a decision; this first ALJ decision was reviewed by this Board on appeal. We affirmed the ALJ's finding that the contractors, and the nurses employed by the contractors, were not entitled to relief. We remanded the matter to the ALJ for a determination whether the nurses employed by the hospital were owed backpay for performing shift and specialty unit work, and, if so, the backpay amounts owed. *U.S. Dep't of Labor, Administrator, Wage & Hour Division, Employment Standards Administration and Nurses PRN of Denver, Inc., Nurses PRN Suncoast, Inc. v. HCA Medical Center Hospital, Largo, Florida*, ALJ Case No. 94-ARN-1, ARB Ord. of Rem. (O.R.), June 28, 1996.

---

[Page 3]

A second ALJ issued a Decision and Order on Remand on July 14, 1997, dismissing the case in its entirety. The ALJ's decision has been appealed to us by the Administrator. For the reasons discussed below, we reverse the ALJ's order of dismissal and remand the case to the ALJ to make the findings directed in our previous order.

## BACKGROUND

In April 1993, the hospital applied to the U.S. Department of Labor Employment and Training Administration to renew its INRA H-1A petition to employ four H-1A nonimmigrant alien nurses. To demonstrate need, the hospital attested to excessive nurse vacancy rates and unutilized bed rates and to the elimination or curtailment of essential health care services. In addressing labor safeguards, the hospital attested that employment of H-1A nurses would not adversely affect the wages and working conditions of U.S. nurses similarly employed and that the hospital's nurses consequently would be paid at least the prevailing wage. 8 U.S.C. §1182(m)(2)(A)(ii) and (iii); 20 C.F.R. §655.310(e). The hospital also attested that it would fulfill certain responsibilities under the program pertaining to the recruitment, retention and training of U.S. nurses. *See* O.R., *slip op.* at 3.

The contractors complained that the hospital had misrepresented attestation elements.[3] After conducting an investigation, the Administrator determined on May 5, 1994, that the hospital had failed to meet conditions of attestation. 8 U.S.C. §1182(m)(2)(E)(ii).

In response to the Administrator's findings, the hospital requested a hearing contesting the finding that it had misrepresented the attested vacancy rate. The contractors also requested a hearing, contesting the Administrator's failure to find additional violations, including that the hospital had failed to pay shift and specialty unit differentials a portion of the prevailing wage rate to non-H-1A nurses whose employment was similar to that of the H-1A nurses.

The ALJ remanded the matter to the Wage and Hour Division for further investigation of the contractors' allegations. On August 30, 1994, the Wage and Hour Division reported to the ALJ that no additional violations had been found; however, the Division's report did not address the issue whether the non-H-1A nurses were entitled to pay differentials.

The ALJ convened a hearing in October 1994. In a decision issued on May 10, 1995, the ALJ found:

(1) The hospital's attested vacancy rate was incorrect, and therefore the hospital had misrepresented a material fact in its attestation.

(2) The hospital's notice to its nurses of the attestation omitted required information, and the hospital neglected to maintain required documentation in support of the attestation; therefore the hospital had failed to meet a condition of the attestation.

[Page 4]

(3) Although the hospital complied with the INRA's prevailing wage provisions in payment of base wage rates, it may not have paid the correct shift and speciality unit differentials because it neglected to elicit this information from the State Employment Security Agency as required under the regulations; therefore the hospital had violated a condition attested to by failing to obtain complete information establishing the prevailing wage.

The ALJ ordered the hospital to determine whether any of its nurses had been paid an incorrect prevailing wage, including pay differentials, and to pay any wages due. *U.S. Dep't of Labor, Administrator, Wage & Hour Division, Employment Standards Administration and Nurses PRN of Denver, Inc., Nurses PRN Suncoast, Inc. v. HCA Medical Center Hospital, Largo, Florida*, ALJ Case No. 94-ARN-1, Dec. and Ord., May 10, 1995.

The hospital apparently never made the determination ordered by the ALJ, but instead petitioned for review of the ALJ's decision. The contractors also petitioned for review of the decision.

On June 28, 1996, the Board issued an order addressing two issues: (1) whether the contractors' nurses, who were displaced by H-1A nurses, were entitled to back pay; and (2) whether the case should be remanded for findings regarding the hospital's liability for failure to pay the prevailing rate to its nurses (including pay differentials). With regard to the first issue,

the Board held that the contractors' employees were not entitled to back pay.[4] On the second issue, the Board remanded the case for a determination of the hospital's liability to its own employees, *i.e.*, its H-1A and non-H-1A nurses, who should have been compensated at the prevailing rate. The contractors and the hospital had joined in requesting a remand, and the Administrator did not object.

The case was assigned to a second ALJ on remand. On December 3, 1996, the ALJ directed the parties to submit additional evidence and briefing on the issue of the hospital's liability. The Administrator requested an opportunity either to reopen the investigation on the wage payment issue, or to reopen discovery in order to examine the hospital's records. The hospital objected to reopening the investigation, citing the disruption that would be caused, and arguing that a new investigation was untimely under the regulations. In addition, the hospital objected to the belated disclosure of records which it argued the Administrator had disregarded previously. On May 21, 1997, the ALJ denied the Administrator's request for further investigation or discovery and directed the parties to submit any additional evidence and briefing.

[Page 5]

On July 14, 1997, the ALJ dismissed the case for lack of evidence. The ALJ found that, although the hospital had failed to pay four H-1A nurses prevailing shift differentials, the Administrator had failed to prove the amounts due these nurses. The ALJ also found that the Administrator failed to prove that the hospital had paid any of its non-H-1A nurses incorrectly. This appeal followed.

On review, the Administrator now argues that the ALJ abused his discretion by foreclosing investigation or discovery which would have permitted compliance with the Board's June 28, 1996, remand order. The hospital counters that dismissal is appropriate because the Administrator essentially waived further investigation. It argues specifically that the Administrator is directed, by regulation, to conduct any investigation, in its entirety, within 180 days of a complaint; that the Administrator seeks to investigate the very same issue that it investigated more than three years ago; and that the Administrator should bear the consequences of its failure to conduct a proper investigation in the first instance.

## DISCUSSION

## I. Procedural Posture of the Case on Remand

The Board's remand of the case was limited to the issue whether the hospital failed to pay its nurses the prevailing wage, including shift and specialty unit pay differentials, during the period of the 1993-1994 attestation. O.R., *slip op.* at 7. The remand contemplated that the ALJ would conduct further proceedings to resolve the issue and that he would enter findings of liability and back pay, if appropriate. *Id.* The proceedings should have focused on shift and specialty unit differentials, since the hospital had complied with the INRA's prevailing wage provisions pertaining to base hourly pay rates. The ALJ previously had found that back pay might be owed to the nurses because the hospital had failed to elicit this information about pay differentials from the State Employment Security Agency as required under the regulations, and because pay differentials were determined to comprise a portion of the prevailing rate. None of the parties objected to the remand; indeed, the hospital requested it.[5]

As noted above, in the first ALJ's Decision and Order issued May 10, 1995, the hospital was

> ordered to determine whether any of its core [non-contract U.S.] nurses similarly employed to [its] H1-A nurses were not paid the correct prevailing wage (including shift differentials) during the period of its 1993-1994 attestation, and if any such nurse was not paid the correct prevailing wage the [hospital] is hereby ordered to pay each such nurse the correct back wages.

*U.S. Dep't of Labor, Administrator, Wage & Hour Division, Employment Standards Administration and Nurses PRN of Denver, Inc., Nurses PRN Suncoast, Inc. v. HCA Medical Center Hospital, Largo, Florida*, ALJ Case No. 94-ARN-1, Dec. and Ord., May 10, 1995, *slip op.* at 10-11. This order that the *hospital* determine whether underpayments had occurred, and

---

[Page 6]

to determine the amount of the underpayment, plainly recognized that the records needed to make such a determination remained in the possession of the hospital. The Board's later 1996 remand order called for precisely the same line of inquiry that had been ordered by the first ALJ. The Board thus anticipated cooperation by the parties when we remanded the case for further findings.

### A. The Parties' Motions on Remand

On remand, the second ALJ ordered the parties to submit evidence of underpayment and briefing. The Administrator requested an opportunity to conduct further investigation or discovery in order to comply with the ALJ's order because she did not have "in her possession, custody, or control" pertinent evidence which existed outside of the hearing record in the hospital's payroll records. Brief in Response to Order on Remand and Request to Perform Investigation dated January 16, 1997, at 2. In response to the Administrator's request, the hospital abruptly changed tack. It asserted that further investigation or discovery was foreclosed because the Administrator lacked authority under the regulations to conduct investigations beyond the 180-day limitation period, and because the Administrator intentionally had ignored evidence of pay differentials during the previous investigation.[6] The hospital charged that it had cooperated fully in the initial investigation despite "significant disruption to [its] business" and that further investigation or discovery would visit "unwarranted and unnecessary intrusion." The hospital stated:

> To force [the hospital] to undergo another investigation, one which [the Administrator] states will take *60 days* and would require "payroll records from the [hospital] demonstrating the pay, including the amounts paid as shift differential, for the period in question, together with the shifts worked by each nurse in the facility" during a one-year period, would severely punish [the hospital] for [the Administrator's] failure to properly investigate this issue three years ago.

Respondent's Memorandum in Opposition to Plaintiff's Request to Perform Investigation or for Discovery dated February 21, 1997, at 2-3 (emphasis in original).

### B. The ALJ's Disposition on Remand

Concurring with the hospital's argument, the ALJ denied the Administrator's request for investigation or discovery, declaring that

> Although the 180 day period may not constitute an absolute bar, I find the cases cited by the government [*Brock v. Pierce County,* 106A S.Ct. 1834 (1986); *Roadway Express v. Dole,* 929 F.2d 1060 (1991)] to not be on point. Those cases dealt with the

time limit of 120 days for issuance of a decision.

[Page 7]

Here we are asked to permit new discovery years after the initial investigation, years after the investigation was required to be completed, and years after the trial of the matter. The basis of the request is that a mistake was made in failing to investigate properly in the first instance. The request to permit discovery is denied.

Fifth Order on Remand issued May 21, 1997, slip op. at 1-2. In the Decision and Order on Remand issued July 14, 1997, the ALJ dismissed the complaint for failure to produce the precise evidence that the Administrator had attempted to obtain by requesting further investigation or discovery. The ALJ compared the prevailing rates required by the State Employment Security Agency with the rates paid by the hospital to its four H-1A nurses, and stated:

Based on the [comparison], I conclude that [the hospital] failed to pay these four nurses the prevailing shift differentials in Pinellas County. [The Administrator] has failed to demonstrate that [the hospital] failed to pay the prevailing shift differentials to any of its other nurses. In addition, [the Administrator] has failed to fulfill its burden of proof as to the amount due these four nurses. Accordingly, because of the failure of [the Administrator] to sustain its burden of proof, this matter is dismissed.

Slip op. at 2-3.

On appeal to the Board, the Administrator contends that the ALJ abused his discretion in denying the Department's requests for additional investigation or discovery, and then dismissing the case.

## II. Time Frames for Investigation

Both the INRA and its implementing regulations contain limitations periods. The INRA provides that "the Secretary of Labor shall establish a process for the receipt, investigation, and disposition of complaints" regarding attestations and that, under such process, the Secretary shall determine "within 180 days after the date [a] complaint is filed" whether a basis exists to make a finding that a facility has failed to meet a condition attested to or has misrepresented a material fact. In the event of such a determination, the Secretary shall provide notice and an opportunity for a hearing "within 60 days of the date of the determination." 8 U.S.C. §1182(m)(2)(E)(ii) and (iii). The INRA does not provide a limitation for issuance of the Secretary's findings following a hearing.

The regulations provide that if the Administrator determines that there is reasonable cause to believe that a complaint warrants investigation, he "shall conduct an investigation within 180 days of the receipt of a complaint." 20 C.F.R. §655.405(c). After investigation, but also within 180 days of receiving the complaint, the Administrator "shall . . . issue a written determination,

[Page 8]

stating whether a basis exists to make a finding that the facility failed to meet a condition of its attestation, or made a misrepresentation of a material fact therein ...." 20 C.F.R. §655.405(d). Any such determination "shall specify any sanctions imposed due to the violations." *Id.* Interested parties may request a hearing within 10 days of the Administrator's determination. 20 C.F.R. §655.420. An ALJ shall be assigned to hear a complaint upon receipt by the Chief ALJ of a hearing request. Hearings shall be convened within 60 days of the Administrator's determination. 20 C.F.R. §655.435. The regulations direct an ALJ to issue a decision within 90 days of receipt of the transcript of hearing. 20 C.F.R. §655.440. Interested parties may petition the Secretary for review of the ALJ's decision within 30 days of its issuance. 20 C.F.R. §655.445. Within 30 days of receipt of a petition, the Secretary shall notify the parties of an intent to review the ALJ's decision. The Secretary's final decision shall issue within 180 days of notification of intent to review. *Id.*

Prior to the Board's remand in this case in 1996, development of the record had proceeded in an orderly manner subject to a degree of flexibility appropriate in an administrative forum. For example, following the Administrator's determination and prior to opening the hearing, the ALJ remanded the complaint to the Wage and Hour Division to consider the contractors' contention that additional violations existed. On review of the ALJ's decision, the Board remanded the case to the ALJ. Neither the INRA nor the regulations provide for a remand by an ALJ to the Wage and Hour Division or a remand by the Board to an ALJ. Remands nonetheless are employed routinely for purposes of rectifying legal errors. *PPG Industries, Inc. v. United States,* 52 F.3d 363, 365-366 (D.C. Cir. 1995).

The second ALJ erroneously discounted case precedent cited by the Administrator in support of the reopening of the record. The 180-day limitation for conducting investigations at issue in the instant case carries none of the indicia that would divest the Administrator of the authority to investigate after expiration of the limitation. While their language may be mandatory, the statutory and regulatory provisions imposing the investigatory time limitation nowhere specify the consequences of a failure to meet the limitation. Ordinarily, if there is congressional or administrative intent to foreclose action in the event that a time limitation is not met, the statute or regulations specify consequences that flow from the failure to meet the limitation. *Brock v. Pierce County,* 476 U.S. 253, 259 (1986) (parallel limitations without specified consequences in Comprehensive Employment and Training Act and implementing regulations were "intended to spur the Secretary to action, not to limit the scope of his authority"). Nothing in the legislative or regulatory history of the matters at issue here suggests an intent to bar agency action beyond the limitations period. Conducting an investigation and issuing a determination may pose unanticipated difficulties, and the ability of the Administrator to meet the limitation may be subject to factors beyond his control. Absent any statement of contrary intent, such a limitation provides a projected timetable for agency action on a given complaint, rather than curtailing the agency's authority to resolve complaints if the time limitation is not met. Mandatory language that an agency "shall" act within a limitations period, standing alone, "does not divest [the agency] of jurisdiction to act after that time." *Id.* at 266.

---

[Page 9]

The Administrator was empowered to conduct further investigation in this case. Moreover, while the hospital argued that prejudice would result from further investigation, it failed to demonstrate the specific manner in which it would suffer prejudice. Absent a finding of prejudice, the mere passage of time over the course of the proceeding offers insufficient basis for denying the Administrator's motion. The ALJ's denial therefore constituted error.

## III. Abuse of Discretion

The Board remanded the case to the ALJ with instructions "to determine whether [the hospital] failed to pay any of its nurses the prevailing wage . . . during the period of . . . attestation and, if so, the amounts due." In execution of the Board's order, the ALJ availed himself of a discovery device to *avoid* making the determination and to dismiss the proceeding. We agree with the Administrator that the ALJ abused his discretion in this instance.

The hospital's objection to further investigation or discovery amounted to a motion for limitation or for a protective order. The scope of discovery under the Federal Rules of Civil Procedure and the regulations governing administrative hearings before ALJs is broad. Fed. R. Civ. P. 26-37; 29 C.F.R. §§18.13-18.23. The rules nonetheless permit adjudicators to impose discovery limitations under certain circumstances.

One such limitation may arise in the event that "the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought." Fed. R. Civ. P. 26(b)(2). In this context, the hospital argued that the Administrator had waived further access to payroll records because she had investigated thoroughly once before.

A second form of limitation is a protective order. The rules provide for protective orders, stating that, upon certification that the movant has attempted in good faith to resolve the dispute and for good cause shown, a court may "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by ordering, *inter alia,* "that the disclosure or discovery not be had." Fed. R. Civ. P. 26(c); 29 C.F.R. §18.15 (provision for protective orders incorporated under ALJ rules of practice and procedure). For example, protective orders may issue to prevent use of discovery for purposes unrelated to a lawsuit. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 34 (1984) (because of liberality of discovery, courts must be authorized to issue protective orders); *Jennings v. Peters,* 162 F.R.D. 120, 122 (N.D. Ill. 1995) (protective orders ensure that power of liberal discovery is not abused); *Adolph Coors Co. v. American Ins. Co.,* 164 F.R.D. 507, 513-514 (D. Colo. 1993) (protective orders restrict the use that a party can make of information obtained through discovery). The process of issuing a protective order generally entails a balancing of interests, *i.e.,* comparison of hardship to the party against whom discovery is sought with the probative value of the information to the discovering party. *In re Eli Lilly & Co., Prozac Prod. Liab. Litig.,* 142 F.R.D. 454, 458 (S.D. Ind. 1992). In this case, the hospital's allegation that it would be affected adversely by further investigation or discovery suggests that it sought

[Page 10]

protection. Under the law governing discovery, the party moving for a protective order bears the burden of showing that protection is warranted. *Landry v. Air Line Pilots Ass'n Int'l,* 901 F.2d 404, 435 (5th Cir.), *cert. denied,* 498 U.S. 895 (1990). In granting the hospital protection, the ALJ imposed the most limiting alternative under the rules preclusion of disclosure or discovery altogether.

The Administrator, when initially investigating and issuing a determination in the case, found no violation as to payment of prevailing wage rates. The Administrator's finding thus had foreclosed development of a record on the issue of pay differentials. While the Administrator technically may have been able to obtain information contained in the hospital's payroll records, she had no reason at that juncture in the case to do so. The first ALJ effectively reversed the "no violation" finding with regard to shift and specialty unit differentials. Limitation under Fed. R. Civ. P. 26(b)(2) does not appear appropriate in these circumstances because the Administrator realistically was not accorded "ample" opportunity through discovery to secure the payroll information.

Reopening the proceedings to receive evidence on an issue is entirely proper where, as here, an agency has erred legally by failing to consider differentials as part of the prevailing wage rate. *Cissell Manufacturing Company v. U.S. Dep't of Labor,* 101 F.3d 1132, 1136-1138 (6th Cir. 1996); *PPG Industries, Inc. v. United States, supra* 52 F.3d at 365-366. The first ALJ sought to develop a record on the issue when he directed the hospital to calculate the amount of underpayment. In denying the Administrator's request for further investigation or discovery because "a mistake was made in failing to investigate properly in the first instance," the second ALJ erroneously disregarded precedent permitting an agency to reopen proceedings for purposes of taking new evidence when its legal determinations are found to be erroneous.

The hospital has failed to demonstrate that it made a good faith effort to resolve the dispute and that it had "good cause" for securing a protective order under Fed. R. Civ. P. 26(c) and 29 C.F.R. §18.15. A finding of good cause requires specific demonstration that disclosure of the requested information will cause a clearly defined and serious injury. *Glenmede Trust Co. v. Thompson,* 56 F.3d 476, 483 (3d Cir. 1995) (failure to sustain burden of demonstrating specific injury from public dissemination of privileged documents). Preclusion of discovery, as ordered by the ALJ in this case, is rare and requires a showing of "extraordinary" or "exceptional" circumstances. *Kaiser v. Mutual Life Ins. Co. of New York,* 161 F.R.D. 378, 380 (S.D. Ind. 1994); *Bucher v. Richardson Hosp. Auth.,* 160 F.R.D. 88, 92 (N.D. Tex. 1994). The hospital's nonspecific claim of "unwarranted and unnecessary intrusion" falls well short of the requisite demonstration. Furthermore, the hospital makes no claim whatever to substantiate the element of "good faith effort" toward resolving a discovery dispute. The ALJ therefore abused his discretion in protecting the hospital from further investigation or discovery.

The ALJ also abused his discretion by ignoring the procedural history of the case. The record before the first ALJ showed that the hospital failed to pay the prevailing wage for shift

---

[Page 11]

differentials. (Indeed, the second ALJ cited this evidence of liability in his July 14, 1997, Decision and Order on Remand, slip op. at 2.) Accordingly, the ARB remanded the case for development of the record as to extent of liability, *e.g.,* for payroll information supporting determinations as to the identity of nurses working shifts for which a differential was due, the number of hours worked and the amounts actually paid. The Administrator had not culled this information as part of the original investigation because of the Wage and Hour Division's finding of "no violation" on this issue; it was this finding of "no violation" that the first ALJ reversed, prompting the ALJ to order the hospital to determine whether its nurses had been underpaid. The hospital apparently failed to comply with the ALJ's order when it instead appealed the decision to the ARB. On review, the ARB *did not reverse* the first ALJ's finding that shift and speciality unit differentials comprised a portion of the prevailing wage, and we remanded for a determination of liability; therefore, further investigation or discovery was integral to securing the information required under the ARB's remand order. The second ALJ thus abused his discretion by curtailing any opportunity whatever for securing this information on remand.

## CONCLUSION

The Decision and Order on Remand issued on July 14, 1997, which dismissed the complaint, is **REVERSED**, and the Fifth Order on Remand issued on May 21, 1997, which denied the Administrator the opportunity to conduct further investigation or discovery, is **REVERSED and VACATED**. The case is **REMANDED** to the ALJ. The ALJ is directed to reopen the record and to obtain evidence from the parties, including the hospital, of any failure by the hospital to pay its nurses the prevailing wage, including pay differentials, and the amounts due. Based on the evidence thus obtained, the ALJ is directed to decide whether the hospital unlawfully failed to pay its nurses the prevailing wage, and to order appropriate relief.

**SO ORDERED.**

**PAUL GREENBERG**
Chair

**E. COOPER BROWN**
Member

**CYNTHIA L. ATTWOOD**
Member

## [ENDNOTES]

[1] Part 504 of Title 29 C.F.R. has been amended to delete its duplication of parallel regulations contained in 20 C.F.R. Part 655. In its current form, Part 504 contains a cross-reference to Part 655. 29 C.F.R. §504.1 (1998).

[2] "Need" presumes a substantial disruption, through no fault of the health care facility, in the delivery of health care services without H-1A nurses. The element may be met by demonstrating a current nurse vacancy rate of seven percent or more, an unutilized bed rate of seven percent or more, the elimination or curtailment of essential health care services or the inability to implement established plans for needed new health care services.

[3] The Denver and Suncoast Nurses PRN (or *Pro Re Nata,* meaning "as needed" or "as necessary") supply nursing services on a daily, weekly or monthly basis. The hospital utilized the contractors' services until October 1989. Thereafter, it augmented its own nursing staff and sharply decreased use of contract nurses. The contractors asserted that their nurses had been displaced by H-1A nurses secured by means of a defective attestation. The contractors sought an award of back pay representing wages lost due to the wrongful displacement and compensation for loss of annual contract sales at the hospital.

[4] The Board found (1) that the contractors' employees were not parties to the action where party status was necessary to assert a claim for back pay and (2) that the damages claimed by the contractors, namely loss of annual contract sales at the hospital, could not be remedied under the INRA.

[5] In its reply brief on review of the first ALJ's decision before the ARB, the hospital requested that the "issue be remanded to the ALJ for determination" and that the Board direct the ALJ to permit the parties to submit additional evidence and briefing on the issue. Reply brief at 19-20.

[6] The Administrator argued that the time limitation was directory rather than jurisdictional, and that the investigator erroneously had been instructed to disregard the pertinent evidence.